# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| WILLIAM BOYD, | : | CIVIL ACTION NO. 07-377 (JJF) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TEMPAY, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

**McCARTER & ENGLISH, LLP**
Katharine L. Mayer (DE Bar ID #3758)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
(302) 984-6300
(302) 984-6399 (fax)
kmayer@mccarter.com

*Attorneys for Defendant, TemPay, Inc.*

Dated:  December 10, 2007

# TABLE OF CONTENTS

**PAGE**

**ARGUMENT** ................................................................................................ 1

**I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT
       LACKS SUFFICIENT FACTUAL ALLEGATIONS ESTABLISHING
       THAT BOYD HAS STANDING TO ASSERT A CLAIM UNDER THE
       SHERMAN ACT OR STATING A CLAIM THEREUNDER**.....................................1

**II.   THE NEW ALLEGATIONS IN BOYD'S BRIEF DO NOT CURE
       THE FATAL DEFICIENCIES IN HIS PLEADING** ......................................2

    **A.    Boyd Has Not Established That He Has Standing To Maintain His
             Claims against TemPay** ...............................................................2

    **B.    Boyd's Brief Does Not Assert Sufficient Facts To State A Claim
             Under Section 1 Of The Sherman Act**..............................................3

    **C.    Boyd's Brief Does Not Assert Sufficient Facts To State A Claim
             Under Section 2 Of The Sherman Act**..............................................4

    **D.    Boyd Had Not Asserted Facts Sufficient To Establish A Conspiracy
             To Monopolize**...........................................................................5

**III.  BOYD'S REQUEST TO AMEND HIS COMPLAINT SHOULD
       BE DENIED BECAUSE IT WOULD BE FUTILE**.......................................5

**CONCLUSION** ................................................................................................7

ME1 6975993v.1

# TABLE OF CITATIONS

**PAGE**

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) .................................................................................................1,2,3

*Borkowski v. Fraternal Order of Police, Philadelphia Lodge No. 5*,
  155 F.R.D. 105 (E.D. Pa. 1994) ...................................................................................3

*Boyd v. Nannas*,
  C.A. No. 07-378-JJF, Mem. Op. (D. Del. July 30, 2007) .....................................1

*City of Pittsburgh v. West Penn Power Comp.*,
  147 F.3d 256 (3d Cir. 1998) .........................................................................................2

*Commonwealth of Pennsylvania v. PepsiCo, Inc.*,
  836 F.2d 173 (3d Cir. 1987) .........................................................................................1

*Deaktor v. Fox Grocery Company*,
  332 F.Supp. 536 (W.D. Pa. 1971) ...............................................................................3

*Fuentes v. South Hills Cardiology*,
  946 F.2d 196 (3d Cir. 1991) .........................................................................................4

*Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.*,
  ___ F. Supp. 2d ___, 2007 WL 2807292 (D. Del. Sept. 26, 2007) ....................5

*Jablonski v. Pan Am. World Airways, Inc.*,
  863 F.2d 289 (3d Cir. 1988) .........................................................................................6

*Marian Bank v. Electronic Payment Servs., Inc.*,
  1997 WL 811552 (D. Del. Dec. 30, 1997).................................................................4

*Medtronic Minimed Inc. v. Smiths Med. MD Inc.*,
  371 F. Supp. 2d 578 (D. Del. 2005) ...........................................................................4

*Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*,
  836 F.2d 173 (3d Cir. 1988) .........................................................................................4

*Roberts v. The Mayor and Burgesses of the London Borough of Brent*,
  2003 WL 21543889 (3d Cir. July 9, 2003) ...............................................................6

*Superior Models, Inc. v. Tolkien Enterprises*,
  1981 WL 40556 (D. Del. Aug. 14, 1981) ..................................................................4

ii

*Telsat v. Entertainment & Sports Programming Network*,
    753 F. Supp. 109 (S.D.N.Y. 1990) .................................................................................3

*Wages v. Internal Revenue Service*,
    915 F.2d 1230 (9th Cir. 1990) .......................................................................................6

*Zeising v. Kelly*,
    152 F. Supp. 2d 335 (S.D.N.Y. 2001).......................................................................... 1

ME1 6975993v.1

<u>**ARGUMENT**</u>

**I.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT LACKS SUFFICIENT FACTUAL ALLEGATIONS ESTABLISHING THAT BOYD HAS STANDING TO ASSERT A CLAIM UNDER THE SHERMAN ACT OR STATING A CLAIM THEREUNDER.**

Rule 12(b)(6) motions test the sufficiency of a pleading.  A pleader must do more than merely incant labels, conclusions and the formulaic elements of a cause of action.  As this Court recently stated when dismissing another complaint filed by Boyd,:

> A complaint does not need detailed factual allegations, however, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations … are true (even if doubtful in fact)."

*Boyd v. Nannas,* C.A. No. 07-378-JJF, Mem. Op. at 3-4 (D. Del. July 30, 2007) (*quoting Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).

In his answering brief, Boyd does not cite a single factual allegation *from his Complaint* as a basis for opposing the motion to dismiss filed by TemPay, Inc. ("TemPay").  Instead, Boyd attempts to overcome the fatal deficiencies in his pleading by seeking to inject new allegations that appear for the first time in his brief.  These new allegations are not properly before the Court on TemPay's motion to dismiss.  *See Zeising v. Kelly*, 152 F. Supp. 2d 335, 344 (S.D.N.Y. 2001) ("Plaintiff cannot 'cure' his pleading deficiencies in the complaint by addressing them in his motion papers."); *see also Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1987).

Boyd's introduction of new allegations in his responsive brief is an improper attempt to counter the primary thrust of Tempay's motion, which is that the complaint fails to allege facts

that, accepted as true, would not establish claims upon which relief can be granted. Accordingly, this Court should dismiss Boyd's complaint.

## II.   THE NEW ALLEGATIONS IN BOYD'S BRIEF DO NOT CURE THE FATAL DEFICIENCIES IN HIS PLEADING.

Even if the Court were to consider the new allegations in Boyd's brief, which now clearly focus the claim as an antitrust claim, the motion to dismiss should be granted. Boyd's new allegations are wholly conclusory and constitute nothing more than a "formulaic recitation of the elements of a cause of action" that the United States Supreme Court has explicitly rejected as a basis for asserting an antitrust claim. *Twombly*, 127 S. Ct. at 1965. As the Third Circuit Court of Appeals observed in affirming the dismissal of an antitrust claim that contained far more detailed allegations than those before the Court here:

> [W]e need not accept as true "unsupported conclusions and unwarranted inferences. . . Nor can we assume that the [plaintiff] can prove facts that it has not alleged…

*City of Pittsburgh v. West Penn Power Comp.,* 147 F.3d 256 (3d Cir. 1998).

### A.   Boyd Has Not Established That He Has Standing To Maintain His Claims against TemPay.

A threshold standing flaw is revealed in plaintiff's expanded assertion of his claims in his brief. His allegations repeatedly refer to conduct that he says caused harm, not to him, but to a company known as Allstaff, Inc. By way of example only, the following allegations appear at pages 2 and 3 of Plaintiff's Response[1].

> 1.    Tempay has committed embezzlement extortion, identity theft, bank fraud to destroy my company (Allstaff, Inc). (Page 2 0f 5)

> 2.    This conspiracy has eliminated Willam Boyd's Allstaff, Inc. from ever competing in this industry. (Page 2 of 5)

---

[1] The pages of Plaintiff's response are not numbered, so the page references are from the electronic filing stamp appearing at the top of the document.

3.      TempPay has clients across the United States and Allstaff serviced Delaware, Maryland, Pennsylvania and new Jersey. (Page 3 of 5)

4.      TempPay, John Boyd, Krista Garrettson, Wilmington Trust and Insurance and Financial Services embezzled money from Allstaff. (Page 3 of 5)

5.      TempPay conspired with John Boyd, Krista Garrettson, Wilmington Trust, Robin (Rizzo) Boyd, Insurance and Financial Services, Harry Morris, Stratus and all of Tempay's clients <u>to eliminate Allstaff's ability to compete in this horizontal market</u>. (Page 3 of 5)(emphasis supplied)

None of these allegations, which are merely conclusory assertions of legal theories alleged to support the relief requested, contain a sufficient factual predicate to sustain the claims asserted.  Even if they did, however, it is clear as a matter of law that plaintiff Boyd has no standing to assert claims belonging to Allstaff, Inc., a separate incorporated entity.  *See, e.g., Borkowski v. Fraternal Order of Police, Philadelphia Lodge No. 5,* 155 F.R.D. 105, 113, (E.D.Pa. 1994) (in the absence of direct individual injury, a corporate shareholder or officer lacks standing to sue for an injury to the corporation); *Deaktor v. Fox Grocery Company*, 332 F.Supp. 536, 541 (W.D. Pa. 1971) (shareholders and employees of a corporation have no claim for relief under the antitrust laws for injuries they suffer as a consequence of the injury done to a corporation by a defendant's conduct in violation of the antitrust laws).

**B.      Boyd's Brief Does Not Assert Sufficient Facts To State A Claim Under Section 1 Of The Sherman Act.**

Courts do not permit antitrust claimants under Section 1 to set in motion costly antitrust discovery merely by using the buzz word "conspiracy."  *See, e.g., Twombly*, 127 S. Ct. at 1966-67 (holding that the antitrust conspiracy alleged must be "plausible" in order to survive a motion to dismiss).  Boyd "must do more than merely allege that a conspiracy exists, [he] must provide some factual basis for that allegation."  *Telsat v. Entertainment & Sports Programming Network*,

3

753 F. Supp. 109, 115 (S.D.N.Y. 1990); *see also Fuentes v. South Hills Cardiology*, 946 F.2d 196, 201 (3d Cir. 1991). Boyd has not and cannot plead facts meeting this burden.

The Third Circuit has expressly rejected conclusory assertions of a conspiracy similar to those made by Boyd. *See e.g., Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("Only allegations of conspiracy which are particularized … will be deemed sufficient."). The Ninth Circuit ruled similarly in *Marian Bank v. Electronic Payment Servs., Inc.*, 1997 WL 811552 (D. Del. Dec. 30, 1997); *see also Medtronic Minimed Inc. v. Smiths Med. MD Inc.*, 371 F. Supp. 2d 578, 586-87 (D. Del. 2005). In other words, Boyd must plead factual allegations, consistent with and subject to the good faith requirements of Fed.R.C.P. No. 11, that TemPay possessed and utilized monopoly power to "foreclose competition" in the relevant market. *Medtronic*, 371 F. Supp. 2d at 586-87 (*quoting United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)). Boyd has not done so and cannot do so.

**C.    Boyd's Brief Does Not Assert Sufficient Facts To State A Claim Under Section 2 Of The Sherman Act.**

Boyd has failed to allege facts evidencing the relevant market. That defect is fatal to his Section 2 claim. *Superior Models, Inc. v. Tolkien Enterprises*, 1981 WL 40556 (D. Del. Aug. 14, 1981) ("With respect to plaintiff's section 2 charge, in the Third Circuit, along with a vast majority of other Circuits, the definition of the relevant market is also required in cases charging an attempt to monopolize.") (*citing Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338 (3d Cir. 1975)). Furthermore, Boyd has not alleged any facts demonstrating that the TemPay had a "specific intent to monopolize" or that the TemPay engaged in "anticompetitive conduct."

**D.    Boyd Had Not Asserted Facts Sufficient To Establish A Conspiracy To Monopolize.**

Boyd's brief also states that TemPay and its alleged sponsors "conspire[ed] to monopolize the temporary market for construction and industrial workers and the financing needed among several states".  This assertion constitutes nothing more than a token effort at a formulaic recitation of the elements of a claim.  It does not come anywhere close to satisfying Boyd's burden of pleading credible facts that evince (i) the existence of a combination or conspiracy to monopolize; (ii) an overt act in furtherance of the conspiracy; and (iii) a specific intent to monopolize.  *Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.*, ___ F. Supp. 2d ___, 2007 WL 2807292 (D. Del. Sept. 26, 2007).  Boyd's Section 2 conspiracy to monopolize claim suffers from the same defect as his Section 1 claim:  the absence of any credible, factual allegations from which the Court could reasonably infer the existence of a conspiracy.

In summary, even when the new allegations in his brief are considered, which they should not be, they do not cure the fatal pleading deficiencies that mandate dismissal of this action.  These new allegations demonstrate that (1) plaintiff has no standing to assert the claims as a matter of law, and (2) even if he did, his claims of monopolization, attempted monopolization and conspiracy to monopolize are devoid of sufficient supporting factual allegations to pass muster and, thus, fail as a matter of law.

## III.    BOYD'S REQUEST TO AMEND HIS COMPLAINT SHOULD BE DENIED BECAUSE IT WOULD BE FUTILE.

In the last sentence of his brief, Boyd requests "that the Court allow [him] a reasonable time to retain counsel and amend [his] complaint."  (Ans. Br. at 6).  Although a plaintiff may be entitled to amend his complaint as a matter of right under Rule 15(a) where no responsive

ME1 6975993v.1

pleading has been filed, the right to amend should be denied if the amendment would be futile. *Roberts v. The Mayor and Burgesses of the London Borough of Brent*, 2003 WL 21543889 (3d Cir. July 9, 2003). "Amendment of the complaint is futile if the amendment will not cure the deficiency in the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss." *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988) (citations omitted); *see also Wages v. Internal Revenue Service*, 915 F.2d 1230, 1235 (9th Cir. 1990) (denying *pro se* plaintiffs' motion to amend because the amendment would not cure the "fundamental defects" in the complaint).

The only additional facts that Boyd has identified for inclusion in an amended complaint are those set forth in his brief. As explained above, consideration of those allegations would not cure the fatal defects in Boyd's pleading. Accordingly, the Court should deny Boyd's request to amend his complaint because amendment here would be futile.

<u>**CONCLUSION**</u>

For the foregoing reasons, and the reasons stated in its opening brief, defendant TemPay respectfully requests that this Court grant its motion to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim for relief, and deny plaintiff William Boyd's request, in the alternative, for leave to amend his complaint.

Respectfully submitted,

**McCARTER & ENGLISH, LLP**

By:     /s/ Katharine L. Mayer

Dated: December 10, 2007    Katharine L. Mayer (DE Bar ID #3758)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
(302) 984-6300
(302) 984-6399 (fax)
kmayer@mccarter.com
*Attorneys for Defendant, TemPay, Inc.*

7

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WILLIAM BOYD,                      :
                                   :
            Plaintiff,             :
                                   :
      v.                           :   Civil Action No. 07-378-JJF
                                   :
THEODORE NANNAS,                   :
                                   :
            Defendant.             :

William Boyd, <u>Pro se</u> Plaintiff, Newark, Delaware.

**<u>MEMORANDUM OPINION</u>**

July 30, 2007
Wilmington, Delaware

Farnan, District Judge

Plaintiff William Boyd filed this action on June 12, 2007. He appears pro se and was granted in forma pauperis status pursuant to 28 U.S.C. § 1915.  (D.I. 4.)

For the reasons discussed below, the Court will dismiss, without prejudice, the Complaint as frivolous and for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B).

## I.  BACKGROUND

Plaintiff alleges his former accountant, Defendant Theodore Nannas, stopped "doing [his] taxes" and, with Plaintiff's brother, sold a company in Plaintiff's name without his permission and without paying taxes.  He alleges Defendant is located in Wilmington, Delaware.  Plaintiff seeks compensatory damages, and a full credit check.

## II.  STANDARD OF REVIEW

When a litigant proceeds in forma pauperis, 28 U.S.C. § 1915 provides for dismissal under certain circumstances.  Section 1915(e)(2)(B) provides that the Court may dismiss a complaint, at any time, if the action is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant immune from such relief.  An action is frivolous if it "lacks an arguable basis either in law or in fact," Neitzke v. Williams, 490 U.S. 319, 325 (1989), and the claims "are of

2

little or no weight, value, or importance, not worthy of serious consideration, or trivial." <u>Deutsch v. United States</u>, 67 F.3d 1080, 1083 (3d Cir. 1995).

In performing the Court's screening function under § 1915(e)(2)(B), the Court applies the standard applicable to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). <u>Fullman v. Pennsylvania Dep't of Corr.</u>, No. 4:07CV-000079, 2007 WL 257617 (M.D. Pa. Jan. 25, 2007) (citing <u>Weiss v Colley</u>, 230 F.3d 1027, 1029 (7th Cir. 2000). The Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. <u>Erickson v. Pardus</u>, –U.S.–, 127 S.Ct. 2197, 2200 (2007); <u>Christopher v. Harbury</u>, 536 U.S. 403, 406 (2002). A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, –U.S.–, 127 S.Ct. 1955, 1964 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). A complaint does not need detailed factual allegations, however "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Id</u>. at 1965 (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the

speculative level on the assumption that all of the complaint's allegations in the complaint are true (even if doubtful in fact)." Id. (citations omitted).  Because Plaintiff proceeds pro se, his pleading is liberally construed and his Complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers. Erickson v. Pardus, -U.S.-, 127 S.Ct. 2197, 2200 (2007) (citations omitted).

## III. ANALYSIS

This case cannot proceed for the simple reason that Plaintiff has not alleged facts that raise a federal question for the Court to consider.  Initially, the Court notes that there are no allegations of diversity of citizenship.  The essence of Plaintiff's Complaint is that his accountant improperly sold a business in his name, failed to pay taxes on the sale, and no longer works as Plaintiff's accountant.  The claims suggest Plaintiff may have a claim under state law, however, the Complaint fail to state a claim under federal law.

Because the Complaint contains no federal question and there are no allegations of diversity of citizenship, the Court has no jurisdiction over the matter.  28 U.S.C. § 1331, 28 U.S.C. § 1332;  See e.g., Manchester v. Rzewnicki, 777 F.Supp. 319, 329 (D. Del. 1991), aff'd,958 F.2d 364 (3d Cir. 1992).  The Complaint must be dismissed for want of jurisdiction.  The Complaint lacks an arguable basis either in law or in fact.  Therefore, the Court

4

will dismiss, without prejudice, the Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B).

## IV.  CONCLUSION

Based upon the foregoing analysis, the Complaint will be dismissed as frivolous, for failure to state a claim upon which relief may be granted, and for want of jurisdiction pursuant to 28 U.S.C. § 1915(e)(2)(B).  Amendment of the Complaint would be futile.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 111 (3d Cir. 2002); Borelli v. City of Reading, 532 F.2d 950, 951-52 (3d Cir. 1976).  An appropriate Order will be entered.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WILLIAM BOYD,                          :
                                       :
            Plaintiff,                 :
                                       :
      v.                               :    Civil Action No. 07-378-JJF
                                       :
THEODORE NANNAS,                       :
                                       :
            Defendant.                 :

## ORDER

NOW THEREFORE, at Wilmington this 30 day of July, 2007, IT

IS HEREBY ORDERED that:

1.  Plaintiff's Complaint is **DISMISSED** pursuant to 28 U.S.C.

§ 1915(e)(2)(B).  Amendment of the Complaint would be futile.

See Grayson v. Mayview State Hosp., 293 F.3d 103, 111 (3d Cir.

2002); Borelli v. City of Reading, 532 F.2d 950, 951-52 (3d Cir.

1976).

UNITED STATES DISTRICT JUDGE

**Bartell, Debra**

| | |
|---|---|
| **From:** | Mayer, Katharine |
| **Sent:** | Monday, December 10, 2007 4:56 PM |
| **To:** | Bartell, Debra |
| **Subject:** | FW: Westlaw Results : 2006 WL 2135811 |



Westlaw_Document
_11_00_09.doc ...

Katharine L. Mayer
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
(302) 984-6399 Facsimile
(302) 984-2494 Direct Fax·
kmayer@mccarter.com

-----Original Message-----
From: Boyer, Peter J.
Sent: Monday, December 10, 2007 4:56 PM
To: Mayer, Katharine
Subject: Fw: Westlaw Results : 2006 WL 2135811

----- Original Message -----
From: westlaw@westlaw.com <westlaw@westlaw.com>
To: Boyer, Peter J.
Sent: Mon Dec 10 12:00:10 2007
Subject: Westlaw Results : 2006 WL 2135811

Westlaw Delivery Summary Report for BOYER, PETER J 3288102

Date/Time of Request:

    Monday, December 10, 2007 11:00 Central
Client Identifier:

    099999-00001-2667
Database:

    DCT
Citation Text:

    Not Reported in F.Supp.2d
Lines:

    650
Documents:

    1
Images:

    0

1

Recipient(s):

    pboyer@mccarter.com


The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

# EXHIBIT B

Westlaw.

--- F.Supp.2d ----                                                                      Page 1

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

**H**
HowardHess Dental Laboratories Inc. v. **Dentsply** Intern., Inc.
D.Del.,2007.

United States District Court,D. Delaware.
**HOWARDHESS** DENTAL LABORATORIES INC. and Philip Guttierez d/b/a Dentures Plus, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
**DENTSPLY** INTERNATIONAL, INC., Defendant.
Jersey Dental Laboratories f/k/a **HowardHess** Dental Laboratories Incorporated, and Philip Guttierez d/b/a Dentures Plus, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
**Dentsply** International, Inc., and named dental dealers, Defendants.
**Civ. Nos. 99-255-SLR, 01-267-SLR.**

Sept. 26, 2007.

**Background:** Dental laboratories brought antitrust class actions against manufacturer of artificial teeth and designated dealers, alleging exclusive dealing and price-fixing conspiracies. Following partial reversal and remand, 424 F.3d 363, laboratories moved for summary judgment and defendants moved for partial dismissal.

**Holdings:** The District Court, Sue L. Robinson, J., held that:

(1) manufacturer was not collaterally estopped from contesting its liability;

(2) court lacked personal jurisdiction over non-resident dealers;

(3) laboratories lacked standing to seek damages from dealers under *Illinois Brick* doctrine; and

(4) dealers did not share manufacturer's alleged intent to monopolize artificial tooth market.

Motions granted in part and denied in part.

**[1] Judgment 228 €═►713(1)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k713 Scope and Extent of Estoppel in General
                228k713(1) k. In General. Most Cited Cases
For collateral estoppel to apply: (1) identical issue was previously adjudicated; (2) issue was actually litigated; (3) previous determination was necessary to decision; and (4) party being precluded from relitigating issue was fully represented in prior action.

**[2] Judgment 228 €═►725(5)**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k723 Essentials of Adjudication
                228k725 Facts Necessary to Sustain Judgment
                    228k725(5) k. Indebtedness or Liability in General. Most Cited Cases
Manufacturer of artificial teeth was not collaterally estopped from contesting its liability in action brought against it by dental laboratories alleging exclusive dealing and price-fixing conspiracies, notwithstanding prior antitrust action against same manufacturer; prior court's finding of anticompetitive effects did not necessarily imply finding in instant action that laboratories had suffered antitrust injury.

**[3] Antitrust and Trade Regulation 29T€═►**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                   Page 2

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

**963(1)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
      29TXVII(B) Actions
        29Tk959 Right of Action; Persons
Entitled to Sue; Standing; Parties
          29Tk963 Injury to Business or Property
            29Tk963(1) k. In General. Most
Cited Cases
"Antitrust injury" is injury of type that antitrust
laws were intended to prevent, and that flows from
that which makes defendants' acts unlawful.

**[4] Antitrust and Trade Regulation 29T ☞969**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
      29TXVII(B) Actions
        29Tk969 k. Jurisdiction and Venue. Most
Cited Cases
District court lacked personal jurisdiction, pursuant
to Clayton Act, over non-resident dealers of
artificial teeth, with respect to action brought by
dental laboratories alleging exclusive dealing and
price-fixing conspiracies; dealers were not
incorporated in forum state, had conducted no
business within state, and had not purposefully
availed themselves of doing business with citizens
of state. Clayton Act, § 12, 15 U.S.C.A. § 22.

**[5] Antitrust and Trade Regulation 29T ☞969**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
      29TXVII(B) Actions
        29Tk969 k. Jurisdiction and Venue. Most
Cited Cases
Clayton Act defendant is "inhabitant" of state for
venue purposes if it is incorporated under laws of
that state. Clayton Act, § 12, 15 U.S.C.A. § 22.

**[6] Antitrust and Trade Regulation 29T ☞967**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and

Enforcement
      29TXVII(B) Actions
        29Tk959 Right of Action; Persons
Entitled to Sue; Standing; Parties
          29Tk967 k. Indirect Purchasers. Most
Cited Cases
Dental laboratories that sued designated dealers of
artificial teeth, alleging exclusive dealing and
price-fixing conspiracies, were barred from
pursuing damages under Sherman Act, since
laboratories, as indirect purchasers, lacked requisite
standing pursuant to *Illinois Brick* doctrine;
complaint contained no indication that manufacturer
and dealers were equal participants in alleged
conspiracies. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[7] Antitrust and Trade Regulation 29T☞
972(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
      29TXVII(B) Actions
        29Tk972 Pleading
          29Tk972(2) Complaint
            29Tk972(3) k. In General. Most
Cited Cases
Dental laboratories that sued designated dealers of
artificial teeth, stemming from purported exclusive
dealing and price-fixing, failed to allege that dealers
shared manufacturer's specific intent to monopolize
artificial tooth market, as required to state antitrust
conspiracy claims under Sherman Act; complaint
did not aver facts from which it could be inferred
that maintaining manufacturer's alleged monopolies
was goal that dealers themselves wanted to
accomplish. Sherman Act, § 2, 15 U.S.C.A. § 2.

**[8] Antitrust and Trade Regulation 29T ☞713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
      29TVIII(A) In General
        29Tk712 Elements in General
          29Tk713 k. In General. Most Cited
Cases

**Antitrust and Trade Regulation 29T ☞715**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

29T Antitrust and Trade Regulation
   29TVIII Attempts to Monopolize
      29TVIII(A) In General
         29Tk712 Elements in General
            29Tk715 k. Intent. Most Cited Cases
To state conspiracy to monopolize claim under Sherman Act, plaintiffs must allege: (1) agreement or understanding between two or more parties; (2) specific intent to monopolize; and (3) overt acts in furtherance of alleged conspiracy. Sherman Act, § 2, 15 U.S.C.A. § 2.

Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, and A. Zachary Naylor, Esquire of Chimicles & Tikellis LLP, Wilmington, DE, of counsel: Thomas A. Dubbs, Esquire, Richard T. Joffe, Esquire, and Craig L. Briskin, Esquire of Labaton Sucharow & Rudoff LLP, New York City, for Plaintiffs.

W. Harding Drane, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, DE, of Counsel for Defendant Nowak Dental Supplies, Inc.; H. Cary A. Des Roches, Esquire of the Law Offices of Cary A. Des Roches, APLC, New Orleans, LA, for Defendants Accu Bite, Inc., Dental Supplies and Equipment, Inc., Hendon Dental Supply, Inc., Henry Schein Inc., Kentucky Dental Supply Co. Inc. n/k/a KDSC Liquidation Corp., Mohawk Dental Co., and Nowak Dental Supplies, Inc.

Kathleen Jennings, Esquire and Karen V. Sullivan, Esquire of Oberly Jennings & Rhodunda, P.A., Wilmington, DE, for Defendant Arnold Dental Supply Co.

Henry E. Gallagher, Esquire and Jaclyn M. Mason, Esquire of Connolly Bove Lodge & Hutz LLP, Wilmington, DE, for Defendants Atlanta Dental Supply Co., Benco Dental Co., and Darby Dental Laboratory Supply Co., Inc.

Kurt M. Heyman, Esquire and Particia L. Enerio, Esquire of Proctor Heyman LLP, Wilmington, DE, for Defendant Burkhart Dental Supply Co.

William D. Johnston, Esquire and Christian Douglas Wright, Esquire of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, of counsel: Margaret M. Zwisler, Esquire, Eric J. McCarthy, Esquire, Charles R. Price, Esquire, and Amanda P. Biles, Esquire of Latham & Watkins LLP, Washington, DC, and Brian M. Addison, Esquire, of Dentsply International Inc., York, PA, for Defendant Dentsply International Inc.

Edward M. McNally, Esquire and Fotini Antonia Skouvakis, Esquire of Morris James LLP, Wilmington, DE, for Defendants Iowa Dental Supply, Co., LLC, Johnson & Lund Co., Inc. and Marcus Dental Supply Co.

William J. Wade, Esquire of Richards, Layton & Finger, Wilmington, DE, for Defendant Patterson Dental Co.

James J. Maron, Esquire, Wayne A. Marvel, Esquire, and Antionette Hubbard, Esquire of Maron Marvel Bradley & Anderson, P.A., Wilmington, DE, for Defendant Pearson Dental Supply, Inc.

Thomas P. Preston, Esquire of Blank Rome LLP, Wilmington, DE, of counsel: Charles W. Jirauch, Esquire of Quarles & Brady LLP, Pheonix, AZ, for Defendant Ryker Dental of Kentucky, Inc.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

### I. INTRODUCTION

*1 Currently pending before the court are several motions in two related cases. Plaintiffs Howard Hess Dental Laboratories, Inc. ("Hess") and Philip Guttierez d/b/a Dentures Plus ("Dentures Plus") filed an antitrust class action against Dentsply International, Inc. ("Dentsply") on April 21, 1999. *Hess Dental Laboratories, et. al v. Dentsply International Inc.* ("the *Hess* action"), Civ. No. 99-255 (D.I.1). Hess subsequently became Jersey Dental Laboratories ("Jersey Dental") and, on April 24, 2001, the same plaintiffs filed an antitrust class action against Dentsply and twenty-six dental dealers.[FN1] *Jersey Dental Laboratories f/k/a Howard Hess Dental Laboratories, Inc. and Philip Guttierez d/b/a Dentures Plus v. Dentsply et. al* (" the *Jersey Dental* action"), Civ. No. 01-267 (D.I.1). An amended complaint was filed in the *Jersey Dental* action on October 10, 2006, wherein plaintiffs allege that defendants have conspired to maintain a purported monopoly on the manufacture of artificial teeth for sale in the United States, to restrain trade by the implementation of exclusive dealing arrangements, and to sell such teeth at anticompetitive prices. (Civ. No. 01-267, D.I. 259 at ¶ 45) Plaintiffs seek damages, equitable relief,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: --- F.Supp.2d ----)**

and costs.

Currently before the court is plaintiffs' motion for summary judgment in the *Hess* action. (Civ. No. 99-255, D.I.256) For the reasons that follow, the court denies plaintiffs' motion. In the *Jersey Dental* action, several motions to dismiss have been filed: (1) motions to dismiss for lack of personal jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(3), brought by nine non-resident defendants (D.I.266) [FN2] and by defendant Nowak Dental Supplies, Inc. ("Nowak") (D.I.274) (collectively, the " non-Delaware defendants"); (2) certain dental dealer defendants' motion to dismiss counts II and IV of the amended complaint (D.I.264); [FN3] and (3) Dentsply's motion to dismiss counts III and V of the amended complaint (D.I.279). For the reasons that follow, the court grants each of these motions.

## II. BACKGROUND

### A. The Parties

Plaintiffs Jersey Dental and Dentures Plus are dental laboratories that purchase Dentsply products, including Dentsply's "Trubyte" brand of artificial teeth, indirectly through dental dealers. They bring this action on behalf of themselves and other similarly situated dental laboratories that have purchased and regularly purchase Dentsply's Trubyte brand of artificial teeth. According to the amended complaint, the class includes "thousands of other similarly situated dental laboratories."(Civ. No. 01-267, D.I. 259 at ¶¶ 2, 3)

Defendant Dentsply is a leading manufacturer and worldwide distributor of products and equipment for the dental market. Through its Trubyte Division, Dentsply manufactures and markets products used by dental laboratories to make dentures and other removable dental prosthetics. (*Id.* at ¶ 4)

*2 The remaining defendants are dental dealers that distribute Dentsply's products, including Trubyte brand teeth, through direct sales to dental laboratories. (*Id.* at ¶¶ 5-26) The dental dealers

are the primary source of distribution of artificial teeth to dental laboratories. (*Id.* at ¶¶ 55, 59) Dental dealers stock a "full array" of products needed to make dentures, including artificial teeth, and generally employ skilled sales and service people to provide services to dental laboratory customers. (*Id.* at ¶ 60)

### B. History of this Antitrust Litigation

For more than fifteen years, Dentsply operated under a policy that discouraged the dental dealers from carrying competitors' artificial teeth. *U.S. v. Dentsply Int'l*, 399 F.3d 181, 185 (3d Cir.2005), cert. denied, 546 U.S. 1089, 126 S.Ct. 1023, 163 L.Ed.2d 853(2006). In 1993, Dentsply adopted " Dealer Criterion 6," which provided that dental dealers promoting Dentsply's products "may not add further tooth lines to their product offering."*Id.* Dentsply's relationship with the dealers is " especially terminable at will" because Dentsply operates on a purchase order basis. *Id.* Dealer Criterion 6 was enforced against dealers that were not "grandfathered" for sales of competing products, i.e., that had carried competing products before 1993. *Id.*"[I]n the recent past, none of [the dental dealers] have given up the popular Dentsply teeth to take on a competitive line."*Id.* Dentsply also "rebuffed attempts by [the grandfathered dealers] to expand their lines of competing products beyond the grandfathered ones."*Id.*

#### 1. The government action

The first suit to be filed regarding Dealer Criterion 6 was an antitrust action filed by the United States(" the government action") on January 5, 1999. (Civ. No. 99-005, D.I.1) In its suit, the government alleged that Dentsply: (1) acted unlawfully to maintain a monopoly in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (2) entered into unlawful restrictive dealing agreements that substantially lessened competition in violation of § 3 of the Clayton Act, 15 U.S.C. § 14; and (3) entered into unlawful agreements in unreasonable restraint of interstate trade and commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. (

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: --- F.Supp.2d ----)**

*Id.*)Following a bench trial, this court entered judgment in favor of Dentsply on August 12, 2003. ( *Id.,* D.I. 517) This court found that Dealer Criterion 6 did not preclude Dentsply's main rivals from marketing their teeth directly to the dental laboratories and, therefore, Dentsply had no power to control prices or exclude competitors from the consumers. (*Id.,* D.I. 514 at 157-59) The Third Circuit reversed, finding that Dealer Criterion 6 functionally excluded competitors from the dealers' network, "a narrow, but heavily traveled channel to the dental laboratories," and ultimately was "a solid pillar of harm to competition."*U.S. v. Dentsply,* 399 F.3d at 190-91.

*3 Following the Third Circuit's mandate (Civ. No. 99-005, D.I.534), the court entered injunctive relief in favor of the government (*Id.,* D.I. 559). The injunction was entered on April 26, 2006 and directed, *inter alia,* Dentsply to cease requiring its dealers to be exclusive Dentsply dealers and to remove Dealer Criterion 6 from its list of dealer requirements. (*Id.*) The injunction will be in effect for seven and one-half years, or until October 26, 2013. (*Id.*)

### 2. The private actions

Plaintiffs Hess and Dentures Plus filed the *Hess* action against Dentsply on April 21, 1999. (Civ. No. 99-255, D.I.1) Plaintiffs alleged the same antitrust violations as the government and, in addition, added causes of action for attempt to monopolize and conspiracy to monopolize, as well as damages claims, against Dentsply. (*Id.*) Dentsply moved for summary judgment against plaintiffs on April 3, 2000. On March 30, 2001, this court granted in part Dentsply's motion. Specifically, the court found that plaintiffs are indirect purchasers who lack standing to sue for damages under *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).(*Id.,* D.I. 181, 182) Therefore, the court granted Dentsply's motion "to the extent the *Hess* plaintiffs [sought] damages" and denied the motion to the extent they sought injunctive relief. (*Id.,* D.I. 182 at 33, found at 2001 WL 624807 (D.Del. Mar.30, 2001))

Less than a month later, on April 24, 2001, plaintiffs filed the *Jersey Dental* action in this court, alleging Sherman Act violations against Dentsply and twenty-six dental dealers (the "dealer defendants ") arising from the same exclusive dealing arrangement alleged in the government and *Hess* actions. (Civ. No. 01-267, D.I.1 [FN4]) This time, plaintiffs alleged that they were direct purchasers. The court subsequently granted Dentsply's motion to dismiss the damages portion of the antitrust claims against it, finding that the indirect purchaser rule still applied to plaintiffs (i.e., that the " co-conspirator" exception to *Illinois Brick* did not apply).(*Id.,* D.I. 166; D.I. 167, found at 180 F.Supp.2d 541 (D.Del.2001)) The court reasoned that despite plaintiffs having named, or attempted to name, all alleged co-conspirators as co-defendants, the policy concerns of *Illinois Brick* were still implicated, namely: (1) nothing prevented the dental dealers, who were not "substantially equal" participants in the alleged conspiracy under any set of alleged facts, from filing their own lawsuits against Dentsply; (2) the difficulties of damage apportionment between direct and indirect purchasers was still present; and (3) plaintiffs did not fall within the group of private attorneys general that Congress created to redress Dentsply's assumed antitrust violation through use of the treble damage remedy. (*Id.,* D.I. 166)

Plaintiffs thereafter moved to amend their complaint in an attempt to overcome some of these deficiencies. The proposed amended complaint alleged that defendants have engaged in a retail price-fixing conspiracy, that intermediary dental dealers act only as agents for Dentsply, that plaintiffs suffered lost profits from the unrealized sale of competitive teeth, and that the dental dealers will not sue Dentsply. (*Id.,* D.I. 170, exs. A & B) The court denied leave to amend, reasoning that plaintiff's amended claims would not withstand a motion to dismiss; the co-conspirator exception to *Illinois Brick* still did not apply because the dental dealers could still sue Dentsply; and *Illinois Brick* barred recovery of lost profits damages because plaintiffs were indirect purchasers. (*Id.,* D.I. 208, found at *Jersey Dental Laboratories v. Dentsply International, Inc.,* 2002 WL 2007916 (D.Del. Aug. 27, 2002))

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: --- F.Supp.2d ----)**

*4 On September 21, 2005, having heard the appeal of the *Hess* action, the Third Circuit affirmed this court's decision that plaintiffs, as indirect purchasers, lacked standing to sue for damages on its exclusive dealing claims. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,* 424 F.3d 363 (3d Cir.2005). The Third Circuit held that a co-conspirator exception for conspiracies that are not resale price maintenance conspiracies "would only exist in circumstances where the middlemen would be barred from bringing a claim against their former co-conspirator-the manufacturer-because their involvement in the conspiracy was 'truly complete'."*Id.* at 378-79.The Court found that plaintiffs did not qualify for such an exception " because the [d]istrict [c]ourt concluded, and [p]laintiffs have conceded, that the dealers' involvement in the alleged conspiracy with Dentsply was **not** 'truly complete'."*Id.* at 383 (emphasis in original). Plaintiffs' admission on appeal that the dealers and Dentsply were not " substantially equal," [FN5] therefore, was fatal to its claim for damages for the alleged exclusive dealing; plaintiffs were nevertheless permitted to proceed under the co-conspirator exception to pursue an action for overcharge damages caused by the alleged vertical price-fixing conspiracy. *Id.* at 384 & n. 19.

### C. The Amended *Jersey Dental* Complaint

Plaintiffs responded to the Third Circuit's *Hess* decision by filing an amended complaint in the *Jersey Dental* action on October 10, 2006. (Civ. No. 01-267, D.I.259) Plaintiffs continue to assert claims against all defendants for retail price-fixing; [FN6] these claims are not challenged in the present motions to dismiss. (*Id.* at ¶¶ 131-136) The amended complaint alleges that Dentsply and the dental dealers engaged in an exclusive dealing conspiracy in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. In counts II and III, plaintiffs allege that Dentsply and the dental dealers conspired to monopolize the artificial teeth market. (*Id.* at ¶¶ 137-165) In count II, plaintiffs seek both damages and injunctive relief against the dealer defendants for this alleged conspiracy. (*Id.* at ¶¶ 148-149) In count III, plaintiffs seek only an

injunction, and not damages, against Dentsply for its role in this alleged conspiracy. (*Id.* at ¶¶ 161, 165)

In counts IV and V, plaintiffs allege that Denstply and the dental dealers conspired to restrain trade which, they allege, constituted a group boycott of Dentsply's competitors. (*Id.* at ¶¶ 166-187) Once again, plaintiffs seek both damages and injunctive relief against the dealer defendants (count IV) (*id.* at ¶¶ 175-176), but seek only an injunction against Dentsply (count V) (*id.* at ¶ 186).[FN7]

### III. STANDARDS OF REVIEW

#### A. Summary Judgment

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)."Facts that could alter the outcome are 'material,' a nd disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then " must come forward with 'specific facts showing that there is a genuine issue for trial.'"*Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."*Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: --- F.Supp.2d ----)**

enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Motion to Dismiss for Lack of Personal Jurisdiction

**\*5** When reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction. *See Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir.1987). To establish personal jurisdiction, a party must allege facts sufficient to satisfy two requirements, one statutory and one constitutional. *See Reach & Assoc., P.C. v. Dencer,* 269 F.Supp.2d 497, 502 (D.Del.2003). With respect to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum state's long arm statute. *See id.* As for the constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *See id.; see also Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

### C. Motion to Dismiss for Improper Venue

A court may dismiss a lawsuit for improper venue pursuant to Fed.R.Civ.P. 12(b)(3). However, the Federal Rules of Civil Procedure do not contain any specific venue provisions or requirements. A court, therefore, must determine whether venue is proper in accordance with the appropriate statutes when deciding a motion to dismiss for improper venue. *See Albright v. Gord,* Civ. A. No. 02-304, 2002 WL 1765340, *3 (D.Del. July 31, 2002) (citations omitted). The moving party has the burden of proving that venue is improper. *See id.* (citing *Myers v. American Dental Ass'n,* 695 F.2d 716, 724 (3d Cir.1982)). "[I]n ruling on defendant['s] motion the plaintiff's choice of venue should not be lightly disturbed." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (citations omitted).

### D. Motion to Dismiss Pursuant to Rule 12(b)(6)

In reviewing a motion filed under Fed.R.Civ.P. 12(b)(6), the court must *accept* all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus,* ---U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); *Christopher v. Harbury,* 536 U.S. 403, 406, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). A complaint must contain " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"*Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"*Id.* at 1964-65 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."*Id.* at 1959.

### IV. DISCUSSION

### A. Plaintiffs' motion for summary judgment in the *Hess* action

**\*6** In the *Hess* action, the dental laboratory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

plaintiffs have moved for summary judgment on their claim against Dentsply for "exclusive dealing/monopoly maintenance" (count II). (Civ. No. 99-255, D.I. 256, D.I. 257 at 1, 5) Plaintiffs claim that, because the Third Circuit found that Dentsply violated section 2 in the government action, Dentsply is collaterally estopped from contesting its liability vis-a-vis the *Hess* complaint. Although Dentsply's violations are claimed to be the same, plaintiffs also claim that they are presently entitled to greater injunctive relief than that awarded by this court in the government action.

### 1. Collateral estoppel

[1] The doctrine of collateral estoppel states that, " once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."*Montana v. U.S.,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) . Plaintiffs must establish the following four requirements for collateral estoppel to apply: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action."*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,* 458 F.3d 244, 249 (3d Cir.2006) (citations omitted). Doubts about application of the doctrine of collateral estoppel should usually be resolved against its use. *See Witkowski v. Welch,* 173 F.3d 192, 206 (3d Cir.1999) (citing *Kauffman v. Moss,* 420 F.2d 1270, 1274 (3d Cir.1970)).

### 2. Discussion

[2] The complaint in the *Hess* action contains certain causes of action pled in the government action, and some new claims. Both cases involve monopoly maintenance, restrictive dealing, and restraint of trade claims against Dentsply.[FN8]*U.S. v. Dentsply,* 399 F.3d at 184, (Civ. No. 99-255, D.I. 1 (counts I, II, and V)) The section 2 claim brought in the government action was a monopoly maintenance claim. *U.S. v. Dentsply,* 399 F.3d at 184."Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power ... There must be proof that competition, not merely competitors, has been harmed."*Id.* at 187 (citations omitted). Following its review of the relevant market, Dentsply's power to exclude, and the efficacy of Dealer Criterion 6, the Third Circuit found in *U.S. v. Dentsply* that "the government established that Dentsply's exclusionary policies and particularly Dealer Criterion 6 violated [s]ection 2" of the Sherman Act. 399 F.3d at 196. Plaintiffs assert that, in view *of* this determination, Dentsply is collaterally estopped from contesting its liability for monopoly maintenance in the *Hess* case. (Civ. No. 99-255, D.I. 257 at 10-14) Dentsply counters that collateral estoppel does not apply because the issue of antitrust injury, specifically, the question of whether plaintiffs paid higher prices due to Dentsply's conduct, was never litigated in the government action. (*Id.,* D.I. 262 at 8-10)

*7 The relevant market for Dentsply's teeth, as defined by the Third Circuit, consists of two consumers combined: the dental dealers and the dental laboratories. *Id.* at 188.The question posed by plaintiffs' motion is, essentially, whether the Third Circuit's finding that competition in this market was harmed necessarily means that plaintiffs have suffered antitrust injury. Put another way, do plaintiffs' claims require proof of specific injuries to plaintiffs, such as higher prices paid?

In support for their argument that an acknowledgment of their injuries is implicit in the Third Circuit's decision, plaintiffs highlight the Court's finding that Dentsply's exclusive dealing had two anti-competitive effects: (1) "keep[ing] sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share"; and (2) "impair [ing] the laborator[ies'] choice in the marketplace." (D.I. 266 at 6-7, 11) (citing *U.S. v. Dentsply,* 399 F.3d at 191, 194) Certainly, these findings are to be given preclusive effect. *See Montana v. U.S.,* 440 U.S. at 153, 99 S.Ct. 970;*Burlington Northern R. Co. v. Hyundai Merchant Marine Co., Ltd.,* 63 F.3d 1227,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 9

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: --- F.Supp.2d ----)**

1231 (3d Cir.1995).

[3] Plaintiffs' estoppel argument, however, impermissibly combines the concepts of causation and injury. Antitrust injury "is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."*Angelico, M.D. v. Lehigh Valley Hospital,* 184 F.3d 268, 273 (3d Cir.1999) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)) (additional citations and internal quotations omitted). Plaintiffs, therefore, must have both suffered an injury, and that injury must have resulted from the occurrence of the condemned events, here, the use of Dealer Criterion 6 and other exclusionary practices to maintain Dentsply's monopoly. It is certainly plausible that plaintiffs, representing one of two consumer groups who collectively form the relevant market in this case, lost profits as the result of Dentsply's exclusionary practices. *See U.S. v. Dentsply,* 399 F.3d at 190-91 ( "experts for both parties testified that were Dealer Criterion 6 abolished, prices would fall," presumably raising the profit margin for the laboratories). The Third Circuit, however, has issued no such finding.

The court declines to infer that a "finding of anticompetitive effects necessarily implies a finding that consumers [here, the dental laboratories] have been hurt" ( D.I. 257 at 19-20),[FN9] in view of the lack of a determination that plaintiffs have suffered an injury in fact (which is demonstrably linked to the conduct which has been proscribed by the Third Circuit) and the nature of such injury. The court, therefore, declines to grant plaintiffs' motion for summary judgment on the ground of collateral estoppel. *See In re Microsoft Corp. Antitrust Litig.,* 232 F.Supp.2d 534, 538 (D.Md.2002) (denying motions for partial summary judgment where " [n]othing in the [previous] government case against Microsoft demonstrate[d] that the consumer plaintiffs ... suffered any such injuries").

**3. Injunctive relief sought**

*8 The court notes that the fact that plaintiffs seek

only injunctive relief rather than damages does not alter plaintiffs' obligation to establish its antitrust injuries. It does, however, provide an additional basis for the court's denial of plaintiffs' motion in view of the fact that Dentsply has already been enjoined from the monopolist activities condemned by the Third Circuit. (Civ. No. 99-005, D.I.559)

Plaintiffs assert that granting another injunction " will not be redundant but, rather, will substantially enhance the effectiveness of the injunctive relief already granted."(Civ. No. 99-255, D.I. 257 at 23) In addition to provisions that are "essentially the same" as the prohibitions set forth in the government's injunction, plaintiffs additionally request that another injunction: (1) be of unlimited duration, as compared *to* seven and a half years; (2) require that Dentsply (a) post the injunction on its website and (b) hire an outside, independent monitor, in contrast to the employee it has designated as the antitrust compliance officer for the government's injunction; and (3) prohibit Dentsply's participation in meetings or phone calls between dental dealers and laboratories absent the laboratories' request. (*Id.* at 25-28)

Aside from its theories on why additional relief would be beneficial to them, plaintiffs have not adequately explained why the government's injunction is insufficient to prevent Dentsply from engaging in anticompetitive practices. In fact, despite seeking a permanent injunction, plaintiffs assert only that they are "threatened with loss or injury proximately resulting from the recurrence of Dentsply's exclusive dealing/monopoly maintenance. "(D.I. 257 at 24) Even if plaintiffs could meet the stringent requirements of the permanent injunction standard (and the court believes they cannot),[FN10] plaintiffs nevertheless fail to demonstrate a need for further, non-duplicative measures to those already in place.[FN11]The court, therefore, denies plaintiffs' motion on the alternative basis that plaintiffs have not demonstrated that they are entitled to additional injunctive relief.[FN12]*See Harthman v. Witty,* 480 F.2d 337, 339-40 (3d Cir.1973) (holding that "a second injunction was unnecessary and it would have been the duty of the court to refuse to grant it" where a first, permanent injunction of broad terms was in place, and plaintiff could have sought relief

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 10

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

for continuing violations under that injunction) (vacating district court's order denying plaintiff's motion for damages); *see also Ellis v. Gallatin Steel Co.,* 390 F.3d 461, 476 (6th Cir.2004) (district court committed reversible error in concluding irreparable harm had been shown, and awarding injunctive relief, three months after standing consent decree was obtained by the government).

## B. The Non-Delaware Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue

Nine non-Delaware defendants move to dismiss in the *Jersey Dental* action for lack of jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(3). (Civ. No. 01-267, D.I.266) [FN13] Defendant Nowak has filed its own motion on these grounds. (D.I.274)

### 1. The Clayton Act

*9 Section 12 of the Clayton Act provides:
Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an **inhabitant,** but also in any district wherein it may be **found or transacts business;** and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (emphasis added). The first clause relates to venue, while the second clause concerns service of process and, therefore, personal jurisdiction. *In re: Automotive Refinishing Paint Antitrust Litigation* (hereinafter, *"Automotive Refinishing "*), 358 F.3d 288, 293 (3d Cir.2004).

### 2. Jurisdiction

In response to defendants' challenge to personal jurisdiction by this court, plaintiffs bear the burden of showing that personal jurisdiction exists.*Marten v. Godwin,* 499 F.3d 290, 294-95 (3d Cir.2007) (citing *Gen. Elec. Co. v. Deutz AG,* 270 F.3d 144, 150 (3d Cir.2001)). Plaintiffs must meet this burden

through "affidavits or other competent evidence." *Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1302 (3d Cir.1996) (citations omitted). Personal jurisdiction must be considered separately from venue pursuant to section 12 of the Clayton Act. *See Automotive Refinishing,* 358 F.3d at 294-97.

Plaintiffs assert that the jurisdictional clause of the Clayton Act requires only that personal jurisdiction be demonstrated by "national contacts," rather than specific contacts with the jurisdiction in which defendants have been sued. (D.I. 289 at 6-13) Since each of the moving defendants are incorporated in one of the states of the United States, plaintiffs assert that sufficient national contacts exist. (*Id.* at 12) In support for their argument, plaintiffs rely on the Third Circuit's decision in *Automotive Refinishing,* 358 F.3d 288, 296-97 (3d Cir.2004); defendants dispute the applicability of *Automotive Refinishing* to the present case.

*Automotive Refinishing* involved an antitrust class action filed against two German corporations that subsequently brought a motion to dismiss for lack of personal jurisdiction. *Id.* at 290.In contrast to the case at bar, the *Automotive Refinishing* Court was not confronted with a challenge to personal jurisdiction brought by domestic corporate defendants. The dispute involved whether the jurisdiction and venue clauses of section 12 operate independently of each other; the *Automotive Refinishing* Court resolved this question by stating that "the service of process provision on **foreign** corporations is independent of, and does not require satisfaction of, the specific venue provision under [s]ection 12 of the Clayton Act."*Id.* at 297 (emphasis added). The *Automotive Refinishing* Court next proceeded to analyze appellants' arguments that section 12 did not confer personal jurisdiction over them, and concluded that " personal jurisdiction in federal antitrust litigation is assessed *on* the basis of a defendant's aggregate contacts with the United States as a whole."*Id.* at 298.

*10 Though this holding is not, in literal terms, limited to jurisdiction over foreign corporations, there are several compelling reasons for limiting *Automotive Refinishing* to its facts. First, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

authority relied upon by the *Automotive Refinishing* Court does not concern domestic defendants. The *Automotive Refinishing* Court relied upon prior Third Circuit precedent set forth in *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361 (3d Cir.2002), in which the Court assessed a foreign defendant's " national contacts" in determining that jurisdiction was appropriate. *Automotive Refinishing,* 358 F.3d at 298-99;*see also Pinker,* 292 F.3d at 371-72 ("A foreign corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court for fraudulently manipulating that market."). T he *Automotive Refinishing* Court also stated that its holding is consistent with Federal Rule of Civil Procedure 4(k)(2), which establishes personal jurisdiction over foreign defendants. 358 F.3d at 298-99;*see also* Fed.R.Civ.P. 4(k)(2)(A) (2007) (personal jurisdiction may be established by service "if the defendant is not subject to jurisdiction in any state's courts of general jurisdiction").

Secondly, and perhaps most importantly, the *Automotive Refinishing* Court had no occasion to consider jurisdiction vis-a-vis domestic defendants; it acknowledged, however, a "crucial" distinction between alien and domestic corporations in its discussion of venue. *Automotive Refinishing,* 358 F.3d at 297 n. 10 ("The general venue provision of 28 U.S.C. § 1391(c) governing such **domestic** corporations is, in contrast to § 1391(d) governing **alien** corporations, **more** difficult to satisfy than the [s]ection 12 venue requirements.") (quoting *Gen. Elec. Co. v. Bucyrus-Erie Co.,* 550 F.Supp. 1037, 1041 (S.D.N.Y.1982)) (internal brackets omitted) (emphasis in original); *see also Cumberland Truck Equipment Co. v. Detroit Diesel Corporation,* 401 F.Supp.2d 415, 421 (E.D.Pa.2005) (noting that the *Automotive Refinishing* Court "emphasized the importance of distinguishing between out-of-state and foreign corporate antitrust defendants" in its opinion) (citing *Automotive Refinishing,* 358 F.3d at 296 n. 10).

Insofar as the Third Circuit has never applied a " national contacts" test for establishing personal jurisdiction over a domestic antitrust defendant, the court declines to extend the holding of *Automotive Refinishing* in a manner that would counterindicate

traditional long-arm jurisprudence with respect to such defendants.[FN14] The court, therefore, will review whether plaintiffs have alleged facts sufficient to satisfy both the Delaware long-arm statute, [FN15] i.e., specific jurisdiction, and the Constitutional due process requirements of the Fifth Amendment, i.e., general jurisdiction, with respect to the domestic defendants.[FN16] *See Automotive Refinishing,* 358 F.3d at 299 ("[P]ersonal jurisdiction under [s]ection 12 of the Clayton Act is as broad as the limits of due process under the Fifth Amendment.") (citations omitted).

**\*11** Specific jurisdiction arises when a defendant has both purposefully directed its activities at residents of the forum state and the action arises from, or is directly related to, the defendant's actions within the forum state. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). As for the Constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *See Reach & Assoc. P.C. v. Dencer,* 269 F.Supp.2d 497, 502 (D.Del.2003); *see also Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

[4] In the case at bar, the moving defendants have submitted affidavits which demonstrate that they are not incorporated in Delaware, and have conducted no business within the State. (D.I. 267, exs. A-H; D.I. 276; D.I. 295, ex. A [FN17]) In response, plaintiffs have put forward no evidence that defendants "purposefully availed" themselves of doing business with Delaware citizens.[FN18] Likewise, the court is not satisfied that defendant Nowak or the non-Delaware defendants "[had] certain minimum contacts with [the State] such that the maintenance of [plaintiffs'] suit does not offend ' traditional notions of fair play and substantial justice.'" *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). For these reasons, the court grants the moving defendants' motions to dismiss on the basis of lack of jurisdiction. (D.I.266, 274)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 12

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

### 3. Venue

Although the court need not address the moving defendants' arguments regarding venue in view of this holding, the court notes that there is no indication that venue in this district is appropriate and, therefore, improper venue provides an alternative basis for the court's disposition of the motions.

[5] In order to establish that venue is improper in this case, defendants must demonstrate that they are not inhabitants of, found in, or do not transact business in, the District of Delaware pursuant to section 12. 15 U.S.C. § 22. A defendant is an " inhabitant" if it is "incorporated under the laws of [Delaware]."*Automotive Refinishing*, 358 F.3d at 293 n. 6 (citation omitted).
Being "found" in a district is generally equated with "doing business" there, and requires greater contacts than does "transacting business." A corporation is "found" where it has "presence" and " continuous local activities" in the district.

*Id.* (citations omitted). Defendants' affidavits demonstrate no such activities within this district.

In response, and despite pleading that venue in this district is proper pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, plaintiffs argue that venue in the District of Delaware is proper pursuant to the general venue statute, 28 U.S.C. § 1391(c), which provides that a corporation is a resident of " any judicial district in which [defendant corporation] is subject to personal jurisdiction at the time the action is commenced."(D.I. 259 at ¶ 27; D.I. 289 at 14) Plaintiffs argue, based on their interpretation of *Automotive Refinishing* and the " national contacts" theory rejected above, that all defendants "reside" in Delaware since "there is personal jurisdiction in this district over each and every [d]efendant."(D.I. 289 at 14)

*12 The court finds that domestic defendants' national contacts do not suffice to render venue appropriate in the District of Delaware. Put another way, section 12 of the Clayton Act may not be supplemented with the general venue provisions of 28 U.S.C. 1391(b) and/or (c) for purposes of

establishing venue for domestic defendants, and must be considered independently of those provisions. *See Cumberland Truck Equipment Co.*, 401 F.Supp.2d at 420-21, 424 (finding that Third Circuit precedent supported "allowing [s]ection 12's venue clause to be supplemented for alien but not domestic defendants.") (citing *Automotive Refinishing*, 358 F.3d at 296 & n. 10).[FN19] To extend *Automotive Refinishing* in such a manner would effectually, and improperly, create unlimited venue for antitrust actions against domestic corporations. *Id.* at 423.

Plaintiffs do not contest the facts as alleged in defendants' affidavits (D.I. 289 at 21), and have provided only legal argument, rather than counter-evidence, in opposition to defendants' motion. The court, therefore, finds that the moving defendants have satisfied their burden to establish that venue in this district is improper; defendants' motions (D.I.266, 274) are properly denied on this alternate ground.

### C. Motions to Dismiss Counts II-V in the *Jersey Dental* Action Pursuant to Rule 12(b)(6)

Counts II and III of the amended complaint contain plaintiffs' conspiracy to monopolize claims against the dealer defendants (count II) and Dentsply (count III). (D.I. 259 at ¶¶ 137-165) Counts IV and V of the amended complaint contain plaintiffs' exclusive dealing claims, in which plaintiffs allege that the dealers (count IV) and Dentsply (count V) conspired to restrain trade, which constituted a group boycott of Dentsply's competitors. (*Id.* at ¶¶ 166-187) Several defendants [FN20] and Dentsply have separately moved to dismiss these claims. (D.I.264, 279 [FN21]) The court will address defendants' arguments in turn.

### 1. Injunctive relief sought against Dentsply for violations asserted in counts III and V

Dentsply asserts that, even assuming plaintiffs have stated viable claims against it, plaintiffs would still lack standing to seek injunctive relief in view of the injunction that has already been secured by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

government. (D.I.279) As discussed above, plaintiffs have not alleged any facts that could demonstrate a threat of future injury and/or irreparable harm. Absent such a proffer, plaintiffs cannot establish that they are entitled to a second injunction against Dentsply for the same conduct currently enjoined by the government's injunction. [FN22]Count V, for which only injunctive relief is sought, therefore, is dismissed for failure to state a claim upon which can be granted.[FN23]With respect to Dentsply's conduct asserted in count III, plaintiffs also seek "a declaratory judgment that Dentsply's actions complained of herein are violations of the prohibition against combining or conspiring to monopolize, under [s]ection 2 of the Sherman Act, 15 U.S.C. § 2," and for this court to order the " divestiture of the Trubyte division from Dentsply." (D.I. 259 at ¶ 165) The parties do not address this proposed relief in their submissions; the court, therefore, proceeds to evaluate defendants' additional arguments with respect to claim III.

### 2. Damages sought from the dealers for violations asserted in counts II and IV

*13 [6] The dealer defendants assert that plaintiffs are barred from suing for damages by reason of the Third Circuit's prior decision in the *Hess* case, in which the Court held that plaintiffs, as indirect purchasers, had no standing to sue under *Illinois Brick.*(D.I. 265 at 23-24 (citing *Howard Hess Dental Labs.,* 424 F.3d at 376, 384)) Plaintiffs respond that, although plaintiffs are indirect purchasers from Dentsply, they are direct purchasers from the dealers, and should not be deemed to be "indirect purchasers" regardless of who plaintiffs' claims are brought against. (D.I. 288 at 37-40)

This court previously determined, and the Third Circuit agreed, that "[t]he intermediate dental dealers suffer the direct harm from any lost opportunity to sell a greater volume of Dentsply products or to sell competitive product lines and profit therefrom. Any harm suffered by plaintiffs remains indirect."*See Howard Hess Dental Labs.,* 424 F.3d at 376.Plaintiffs "claim[ed] that they come within the [general] 'co-conspirator exception' to

*Illinois Brick* because their purchases from Dentsply's dealers were made [directly] from members of an exclusive-dealing conspiracy."*Id.* at 378.The Third Circuit disagreed, since the facts did not demonstrate that "the [dealer] middlemen would be barred from bringing a claim against [Dentsply]." *Id.* at 379.

Plaintiffs are correct that the Third Circuit had no occasion in *Hess* to evaluate plaintiffs' standing to sue the dealers for damages, as the dealers were not parties to that action. Nevertheless, counts II and IV in the case at bar allege non-vertical price-fixing conspiracies that are subject to the Third Circuit's ruling. *Howard Hess Dental Labs., Inc.,* 424 F.3d at 378 (a general co-conspirator exception "would only exist in circumstances where ... [the dealers'] involvement in the conspiracy was 'truly complete'. ") This is so regardless of the fact that plaintiffs purchased artificial teeth "directly" from the dental dealers. As in *Hess,* and as discussed in further detail *infra,* the amended complaint in the present action contains no indication that Dentsply and the dealers were equal participants in the alleged conspiracies. Consequently, there is no indication that plaintiffs may pursue overcharge damages from the dealers pursuant to the general co-conspirator exception of *Illinois Brick.*Dismissal of counts II and IV is appropriate, therefore, on the basis that plaintiffs cannot obtain the relief sought.

### 3. Counts II and III-specific intent

[7] The court also finds that dismissal of counts II and III is appropriate for failing to allege any factual allegations that support plaintiffs' claim that the dental dealers shared Dentsply's specific intent for Dentsply to monopolize the artificial tooth market. (D.I. 265 at 17-22; D.I. 279)

[8] To state a conspiracy to monopolize claim, plaintiffs must allege: (1) an agreement or understanding between the dealers and Dentsply; (2) a specific intent to monopolize; and (3) overt acts in furtherance of the alleged conspiracy. *See Untracht v. Fikri,* 454 F.Supp.2d 289, 315 (W.D.Pa.2006) (citation omitted); *ID Security Systems Canada, Inc. v. Checkpoint Sys., Inc.,* 249

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.Supp.2d 622, 657 (E.D.Pa.2003) (citing *Pontius v. Children's Hosp.,* 552 F.Supp. 1352, 1377 (E.D.Pa.1982)). The specific intent element requires plaintiffs to plead that both alleged conspirators " had a conscious commitment to [Dentsply's] common scheme designed to achieve an unlawful objective, namely that of endowing [Dentsply] with monopoly power."*ID Security Systems Canada, Inc.,* 249 F.Supp.2d at 660 (citation and internal quotations omitted).

*\*14* To this end, plaintiffs have pled that the dealer defendants "have conspired with Dentsply and with each other to, among other things, restrict Dentsply's dealers from carrying the artificial teeth of any competing manufacturer, and to restrict which dealers are allowed to carry Dentsply's artificial teeth."(D.I. 259 at ¶ 72) Plaintiffs further assert that "the intended effect of this exclusive dealing arrangement, known to each and every [d]efendant, has been the elimination of any and all competition to Dentsply sufficiently significant to pose a threat to its monopoly of the markets for artificial teeth and/or premium artificial teeth sold in the U.S."(*Id.* at ¶ 73) Finally, "each and every [d]efendant knew that this exclusive dealing arrangement was and is an illegal restraint of trade designed to maintain Dentsply's monopoly."(*Id.* at ¶ 74)

On its face, the asserted complaint contains the general allegation that the dealers intended for Dentsply to maintain a monopoly. (*Id.* at ¶¶ 73, 156)[FN24] The court finds that plaintiffs have not, however, pled "facts from which it can reasonably be inferred that the [dealers] formulated [the] intent" that "maintaining [Dentsply's] monopolies was a goal that they themselves wanted to accomplish."*In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d 728, 731 (D.Md.2001).

The amended complaint does not appear to contain and, indeed, plaintiffs do not point out any facts that could supplement their general assertion of intent. In contrast, and as discussed previously, plaintiffs have maintained throughout this litigation that the dealers were coerced into accepting Dentsply's terms. Plaintiffs have pled that Dentsply demanded the dealers' participation in the exclusive dealing

arrangement (*id.* at ¶¶ 81, 84); in fact, several dealer relationships were terminated by Dentsply when dealers did not accept its terms (*id.* at ¶¶ 91-99). Based on plaintiffs' own allegations, "it is at least as likely that the [dealer] defendants simply chose to make the best of a bad situation" in order to have access to the Dentsply tooth line. *In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d at 732.

In response to Dentsply's motion, plaintiffs assert that a specific intent is "inferable, without more, from [the dealers'] participation in a conspiracy whose purpose and means is the unlawful ... creation or maintenance of a monopoly." (D.I. 288 at 34) This logic, however, is circular; an element required to prove the existence of conspiracy cannot be inferred from the existence of a conspiracy. Plaintiffs also assert that "the fact that a conspirator has been threatened does not necessarily mean that when it finally decides to **agree to conspire,** its only motive is fear."(D.I. 288 at 35) (emphasis added). This argument, again, presumes the presence of a conspiracy in the first instance. Even if the dealer defendants were compensated for their acceptance of Dealer Criterion 6, it does not follow that they shared the specific intent for Dentsply to achieve a monopoly.

*\*15* Finally, plaintiffs' allegation that the defendants have conspired, "each with all of the others," to achieve a Dentsply monopoly does not substantiate plaintiffs' claim that defendants were part of a single conspiracy. No facts have been pled from which it could be inferred that the dealer defendants acted in unison, "sharing a unity of purpose" or a "meeting of the minds," rather than in parallel.[FN25]For all of these reasons, the court finds that plaintiffs have not sufficiently pled a section 2 conspiracy to monopolize claim. *See In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d at 733-34 (granting defendant's motion to dismiss conspiracy to monopolize claim under similar circumstances).

## V. CONCLUSION

For the aforementioned reasons, plaintiffs' motion for summary judgment in the *Hess* action (Civ. No.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ---                                                                    Page 15

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

99-255, D.I.256) is denied, and each of the motions to dismiss in the *Jersey Dental* action (Civ. No. 01-267, D.I.264, 266, 274, 279) are granted. An order shall follow.

### ORDER

At Wilmington this 26th day of September 2007, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment (Civ. No. 99-255, D.I.256) is denied.

2. Defendants' motion to dismiss counts II and IV of the amended complaint (Civ. No. 01-267, D.I.264) is granted.

3. Defendants' motion to dismiss for lack of personal jurisdiction and improper venue (Civ. No. 01-267, D.I.266) is granted.

4. Dentsply's motion to dismiss counts III and V. of the amended complaint (Civ. No. 01-267, D.I.272) is denied as moot.

5. Defendant Nowak's motion to dismiss for lack of personal jurisdiction and improper venue (Civ. No. 01-267, D.I.274) is granted.

6. Dentsply's motion to dismiss counts III and V. of the amended complaint (Civ. No. 01-267, D.I.279) is granted.

FN1. The defendants are Dentsply; A. Leventhal & Sons, Inc.; Accubite Dental Lab, Inc.; Addium Dental Products; Arnold Dental Supply Company; Atlanta Dental Supply Company; Benco Dental Company; Burkhart Dental Supply Company; Darby Dental Laboratory Supply Co., Inc.; Dental Supplies and Equipment, Inc.; Edentaldirect.com, Inc., as successor to Crutcher Dental, Inc.; Hendon Dental Supply, Inc.; Henry

Schein, Inc. and its affiliates, including, without limitation, Zahn Dental Co., Inc.; Iowa Dental Supply Co.; Jahn Dental Supply Company; JB Dental Supply Co., Inc.; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc., a/k/a KDSC Liquidation Corp.; Marcus Dental Supply Co.; Midway Dental Supply Inc.; Mohawk Dental Co. Inc.; Nashville Dental Supplies, Inc.; Nowak Dental Supplies, Inc.; Patterson Dental Company, its subsidiaries, predecessors, successors, assigns, affiliates, and related companies; Pearson Dental Supplies, Inc.; Ryker Dental Supplies, Inc.; and Thompson Dental Company.

FN2. The moving defendants are Arnold Dental Supply Company; Atlanta Dental Supply Company; Dental Supplies and Equipment, Inc.; Iowa Dental Supply Company, LLC; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc. n/k/a/ KDSA Liquidation Corporation; Marcus Dental Supply Company, Inc.; Mohawk Dental Co.; and Ryker Dental of Kentucky, Inc.

FN3. The moving defendants are Accubite Dental Lab, Inc.; Arnold Dental Supply Company; Atlanta Dental Supply Company; Benco Dental Company; Burkhart Dental Supply Company; Darby Dental Laboratory Supply Co., Inc.; Dental Supplies and Equipment, Inc.; Hendon Dental Supply, Inc.; Henry Schein, Inc.; Iowa Dental Supply Co.; Jahn Dental Supply Company; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc., a/k/a KDSC Liquidation Corp.; Marcus Dental Supply Co.; Mohawk Dental Co. Inc.; Nowak Dental Supplies, Inc.; Patterson Dental Company; Pearson Dental Supplies, Inc.; and Ryker Dental Supplies, Inc. (D.I.264)

FN4. In their original complaint, the Jersey Dental plaintiffs alleged that the named defendants conspired to restrain trade in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; conspired to monopolize in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and conspired to restrain trade in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

FN5. (Civ. No. 01-267, D.I. 273 at 9 (citing Appellants' Reply Br. at 23 n. 16)) Plaintiffs do not contest defendants' recount of these statements in their responsive brief. (D.I. 290 at 26)

FN6. Omitted from the amended complaint are originally-named defendants A. Leventhal & Sons, Inc.; Midway Dental Supply Inc.; Nashville Dental, Inc.; and Thompson Dental Company. (D.I.259) Zila, Inc. is presently named "as successor to Ryker Dental of Kentucky, Inc."(*Id.*)

FN7. Plaintiffs state in the heading for count V that this claim is "[a]gainst Dentsply, for [i]njunctive [r]elief," but, aside from alleging that plaintiffs have no adequate remedy at law (*id.* at 175), fail to particularly request injunctive relief vis-a-vis Dentsply in the body of the amended complaint. (*Compare id.* at ¶ 176 (seeking "damages from the [d]ealer [d]efendants, ... and a permanent injunction enjoining the continuing violation of [s]ection 1 of the Sherman Act, 15 U.S.C. § 1"))
For each count discussed above, plaintiffs also seek a declaratory judgment that the complained-of actions constitute Sherman Act violations. (*Id.* at ¶¶ 149, 165, 176, 187)

FN8. Plaintiffs acknowledge that the *Hess* complaint contains two claims against Dentsply not pled in the government action: attempt to monopolize; and conspiracy to monopolize in violation of section 2 of the Sherman Act. (Civ. No. 99-255, D.I. 257 at 2; D.I. 1 (counts III and IV)) Plaintiffs limit their motion to

count II, or their "exclusive dealing/monopoly maintenance" claim. (*Id.* at 1, 5)

FN9. The authority cited by plaintiffs on this point is not persuasive. (D.I. 257 at 19-20) In *Serpa Corp. v. McWane, Inc.,* 199 F.3d 6 (1st Cir.1999), the First Circuit affirmed a finding that plaintiff did not have standing based on antitrust injury where plaintiff brought "its claim as [n]either a competitor [n]or a consumer but as a distributor whose injuries resulted from the loss of [market] position."*Id.* at 12.In *Bell v. Dow Chem. Co.,* 847 F.2d 1179 (5th Cir.1988), the Fifth Circuit also affirmed the district court's holding that plaintiff, a manufacturer-seller who was " neither a consumer nor a competitor" in the relevant market, did not have standing where "there [was] no evidence that [defendant's] conduct caused the loss of future sales, as opposed to any number of factors-e.g. price, market conditions, unproven technology, limited product uses, or [plaintiff's] inability to purchase technical material from other distributors." *Id.* at 1183.Finally, the Third Circuit's decision in *In re Docteroff,* 133 F.3d 210 (3d Cir.1997), in which the Court found that a plaintiff who was barred from contesting liability for a debt as a sanction for discovery abuses could not challenge the debt in a subsequent bankruptcy proceeding, is equally unpersuasive in this context. *Id.* at 215 ("We do not hesitate in holding that a party such as Docteroff, who deliberately prevents resolution of a lawsuit, should be deemed to have actually litigated an issue for purposes of collateral estoppel application.").

FN10. In deciding whether to grant a permanent injunction, courts must consider whether: "(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: --- F.Supp.2d ----)**

result in even greater harm to the defendant; and (4) the injunction would be in the public interest." *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001).
The Third Circuit has recently recognized a conflict in its precedent regarding whether irreparable harm is a prerequisite to the grant of a permanent injunction relief. *See Stolt-Nielsen, S.A. v. U.S.,* 442 F.3d 177, 185 n. 5 (3d Cir.2006) (collecting cases).

FN11. This case presents a scenario opposite to that presented in *U.S. v. Borden Co.,* 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954), where the Court found a refusal to grant the **government** an injunction under the Clayton Act in view of the existence of a **private** injunction already in place. In *Borden,* the Court noted that a private litigant "may be expected to exercise [its remedy] only when its personal interest will be served," while the "[g]overnment [has a] right and duty to seek an injunction to protect the public interest [ ] without regard to any private suit or decree."*Id.* at 518-19, 74 S.Ct. 703.
While plaintiffs argue in this case that it would be advantageous to have over 7,000 dental laboratories police Dentsply's conduct (Civ. No. 99-255, D.I. 257 at 23), clearly any dental laboratory can notify the government of any further antitrust violations by Dentsply, regardless of the status of the instant private litigation.

FN12. It appears as though the record in this case is closed; it is unclear to the court whether plaintiffs have, but did not put forward, evidence sufficient to demonstrate antitrust injury and that additional injunctive relief is warranted (notwithstanding the presence of the government's injunction). The court will provide a mechanism for the parties to address these issues.

FN13. Hereinafter, all docket items

referenced by the court refer to the *Jersey Dental* action, Civ. No. 01-267.

FN14.*Cf. Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d 1174, 1180 (9th Cir.2004).

FN15.10 Del. C. § 3104(c).

FN16. Defendants have not challenged the sufficiency of service under Delaware's long-arm statute.

FN17. Plaintiffs assert that Ryker Dental has been succeeded by Zila, Inc., a Delaware corporation. (D.I. 289 at 20) Ryker Dental asserts that Zila, Inc. is not its successor, but its parent corporation, and has submitted a Certificate of Existence issued by the Commonwealth of Kentucky which demonstrates that Ryker Dental is a distinct corporate entity in good standing in that state. (D.I.295, ex. A) As Zila, Inc. is not a party to this litigation, and the record demonstrates that Ryker Dental and Zila, Inc. maintain distinct corporate indentities, plaintiffs' assertions that Ryker Dental is an inhabitant of Delaware (and has "waived any objection to venue") are unpersuasive.

FN18. Because jurisdiction based on specific contacts is lacking, there is clearly no general jurisdiction based upon " systematic" or regular contacts with this forum. 10 Del. C. § 3104(c)(4).

FN19. The court in *Cumberland Truck Equipment Co. v. Detroit Diesel Corporation,* 401 F.Supp.2d 415 (E.D.Pa.2005), analyzed in detail three distinct approaches utilized by district courts for assessing proper venue when a plaintiff asserts personal jurisdiction pursuant to section 12:(1) courts that " suggest that a plaintiff suing a domestic defendant for antitrust violations must use the [s]ection 12 venue clause exclusively, but allow a plaintiff suing an alien

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                Page 18

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
(Cite as: --- F.Supp.2d ----)

defendant to use the general alien venue statute, 28 U.S.C. § 1391(d)"; (2) courts that allow plaintiffs to establish venue under section 12 or an alternative source interchangeably; and (3) courts that "find that the [s]ection 12 venue claims is the exclusive venue for all defendants, alien and domestic, and it preempts the general venue statutes." *Id.* at 420 (collecting cases).

The district court in *Automotive Refinishing,* affirmed by the Third Circuit, noted that

[t]he broad grant of venue under [Section 1391(d) ] is inapplicable to domestic corporations ... [N]othing in *Go-Video[, Inc. v. Akai Electric Co.,* 885 F.2d 1406 (9th Cir.1989) ] permits a domestic corporation to be sued in any district. Rather, a domestic corporation could only be sued [ ] according to [s]ection 12....

*In re Automotive Refinishing Paint Antitrust Litigation,* No. Civ. A. 1426, 2002 WL 31261330, *9 (E.D.Pa. July 31, 2002) (citation omitted). The court, therefore, agrees with the rationale of *Cumberland Truck* that the Third Circuit approves of the first approach discussed above, or allowing supplementation of section 12 venue only for alien corporations. *See Cumberland Truck Equipment Co.,* 401 F.Supp.2d at 420-21.

FN20.*Supra* n. 3

FN21. The current motion is a corrected version of D.I. 272, which is denied as moot.

FN22. There is no indication, and the court does not assume, that the injunction sought by plaintiffs in the *Jersey Dental* suit would contain stricter measures than those imposed by the government's injunction, such as has been asserted by plaintiffs in the *Hess* action.

FN23. As discussed *supra* (fn. 7), plaintiffs characterize count V as "

[a]gainst Dentsply, for [i]njunctive [r]elief, " but, aside from alleging that plaintiffs have no adequate remedy at law (*id.* at 175), plaintiffs fail to particularly request injunctive relief with respect to Dentsply in the body of that count. (*See* D.I. 249 at ¶ 187 (seeking damages from the dealer defendants, a declaratory judgment that the dealers' actions violate section 1 of the Sherman Act, and generally, "a permanent injunction enjoining the continuing violation of [s]ection 1")) The parties have not addressed this discrepancy. For purposes of the present motion, and consistently with the parties' arguments, the court has treated count V as seeking injunctive relief from Dentsply.

FN24. Plaintiffs point only to paragraphs 71-74 of the amended complaint in support for their argument that specific intent was pled. (D.I. 288 at 34; D.I. 290 at 27-28)

FN25. Similarly, plaintiffs have not proffered facts that could demonstrate a " concerted action" between the defendants as required for plaintiffs' section 1 claims (counts IV & V).*See Cosmetic Gallery, Inc. v. Schoeneman Corp.,* 495 F.3d 46, 55 (3d Cir.2007) ("[u]nilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation.") (citation omitted); *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 182 (3d Cir.1988) ("[A] plaintiff must plead the essential facts of a horizontal restraint or group boycott in order to plead either properly.... A general allegation of conspiracy without a statement of facts is an allegation of a legal conclusion and insufficient to constitute a cause of action." ) (quoting *Black & Yates v. Mahogany Ass'n,* 129 F.2d 227, 231-32 (3d Cir.1941) ) (internal quotations omitted).

This deficiency is especially troubling considering that the dealers had no rational motive to join a conspiracy with Dentsply which would limit the dealers' ability to sell a variety of products to its customers.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                              Page 19

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: --- F.Supp.2d ----)**

*See U.S. v. Dentsply,* 399 F.3d at 192 (dealers "provide laboratories the benefit of 'one stop shopping' and extensive credit services. Because dealers typically carry the products of multiple manufacturers, a laboratory can order, with a single phone call to a dealer, products from multiple sources."). Dismissal of these counts, therefore, is appropriate on this alternate ground. *See Brunson Communs., Inc. v. Arbitron, Inc.,* 239 F.Supp.2d 550, 562 (E.D.Pa.2002) ("[U]nder any theory, Plaintiff has not alleged the essential statutory element of concerted activity ... The facts alleged in the Amended Complaint are extremely vague and do not sufficiently describe any contract, combination or conspiracy") (dismissing section 1 claim).

D.Del.,2007.
Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.
--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

**H**
Bank v. **Electronic** Payment Services, Inc.
D.Del.,1997.

United States District Court, D. Delaware.
**MarianBANK**, Plaintiff,
v.
**ELECTRONIC** PAYMENT SERVICES, INC.;
Corestates Financial Corp.; PNC Bank Corp.;
Banc One Corp., Defendants.
**No. Civ.A. 95-614-SLR.**

Dec. 30, 1997.

Joseph A. Rosenthal, Kevin Gross, Rosenthal,
Monhait, Gross & Goddess, Wilmington, Delaware,
for plaintiff, of counsel.
Merrill G. Davidoff, Martin I. Twersky, Nina H.
Amster, Berger & Montague, Philadelphia,
Pennsylvania, Paul R. Rosen, Jeffrey M. Goldstein,
Spector, Gadon & Rosen, Philadelphia,
Pennsylvania, of counsel.
Donald E. Reid, Morris, Nichols, Arsht & Tunnel,
Wilmington, Delaware, for defendants, of counsel.
Peter Buscemi, Stephen P. Mahinka, and Brad Fagg
, of Morgan, Lewis & Bockius LLP, Washington,
D.C., of counsel.

**MEMORANDUM OPINION**
ROBINSON, J.

**I. INTRODUCTION**

*1 On October 13, 1995, plaintiff Marian Bank
filed a five count complaint against defendants
Electronic Payment Services ("EPS"), CoreStates
Financial Corp. ("CoreStates"), PNC Bank Corp. ("
PNC"), and Banc One Corp. ("Banc One") alleging
antitrust violations under the Sherman Antitrust Act
("Sherman Act"). 15 U.S .C. §§ 1 and 2. Counts I,
II, and IV of the complaint allege conspiracies in
violation of § 1 of the Sherman Act. Count III
alleges unlawful monopolization and attempted

monopolization in violation of § 2 of the Sherman
Act. Count V alleges violations of the anti-tying
provision of the Bank Holding Company Act. 12
U.S.C. § 1972.

On July 15, 1996, plaintiff filed a motion for class
certification. (D.I.45) Defendants opposed the class
certification motion (D.I.54) and filed a motion to
dismiss. (D.I.49) In a memorandum opinion and
order dated February 5, 1997, this court granted in
part and denied in part defendants' motion to
dismiss. (D .I. 71, 72) In particular, the court
dismissed defendant EPS from the case entirely and
dismissed counts III and V (the non-conspiracy
claims) as to defendants Banc One and PNC. The
court also denied plaintiff's motion for class
certification, but granted it leave to file an amended
motion consistent with the memorandum opinion.
(D.I.72)

On February 25, 1997 plaintiff filed a motion to
amend the complaint. (D.I.77) Defendants
responded to plaintiff's motion, but did not
specifically oppose the filing of an amended
complaint. (D.I. 81 at 4) On July 25, 1997, plaintiff
filed its amended complaint. (D.I.110)

Presently before the court are defendants' motion
for partial summary judgment and plaintiff's
renewed motion for class certification. (D.I.97, 79)
Both motions have been fully briefed and oral
argument held. (D.I.112) For the following reasons
the court shall grant defendants' motion and deny
plaintiff's motion.

**II. BACKGROUND**

Plaintiff's amended complaint does not substantially
change the antitrust allegations set forth in its
original complaint. Plaintiff's antitrust allegations
closely follow the allegations set forth in a
complaint and Competitive Impact Statement filed
by the United States against EPS. See59 F.R. 24711

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

(May 12, 1994), 1994 WL 178790. The gravamen of plaintiff's complaint concerns the business practices of the regional ATM (automated teller machine) network currently owned and operated by EPS: the MAC ATM network. EPS was formed in December 1992 by four bank holding companies: (1) CoreStates; (2) PNC; (3) Banc One; and (4) Key Corp. In forming EPS, the bank holding companies merged their separately owned and operated ATM networks into one ATM network under the MAC brand and logo. Prior to the formation of EPS, CoreStates owned and operated its ATM network using the MAC brand and logo.

As explained in more detail below, plaintiff alleges that the defendants engaged in a course of conduct to substantially reduce competition in the markets for regional "ATM network access" and "ATM processing." (D.I. 110 at 9-13) According to plaintiff, defendants' conduct reduced competition in five relevant geographic markets: Delaware, Pennsylvania, West Virginia, New Jersey, and Ohio. (D.I. 110 at 5) Plaintiff seeks to represent a class "of all depository institutions in the affected states that participated in the ATM Network and utilized defendants' ATM processing services (excluding defendants and their respective parents, subsidiaries and affiliates) during the four year period preceding April 21, 1994." (D.I. 110 at 20) In the alternative, plaintiff seeks to represent the proposed class for the "period April 21, 1990 through and including December 3, 1992 ..." (D.I. 80 at 5-6)

**\*2** Defendants oppose class certification and have also challenged Marian Bank's authority to assert claims for damages that occurred after April 17, 1992. On that date, Marian Bank was placed into receivership. On April 20, 1992 a state-owned bank, The Marian State Bank, was created to replace Marian Bank. According to the amended complaint, the Asset Management Committee of Marian Bank ("the Committee") "has the legal authority and power to maintain this action on behalf of Marian Bank and, as a result of an assignment, also owns and asserts claims of [The] Marian State Bank relating to this lawsuit." [FN1] (D.I. 110 at 2) The facts relating to the seizure of Marian Bank and the subsequent creation of the

Asset Management Committee are relevant to both defendants' motion for partial summary judgment and Marian Bank's motion for class certification.

> FN1. For the purposes of this opinion, Marian Bank and the Committee will be used interchangeably.

**A. Seizure of Marian Bank**

On Friday, April 17, 1992, the Secretary of Banking of the Commonwealth of Pennsylvania ("Secretary" ) placed Marian Bank into receivership pursuant to § 504 of the Department of Banking Code, 71 P.S. § 733-504 (amended 1993). (D.I.51, Ex. 1) The Secretary, having determined that Marian Bank was insolvent and that immediate action was necessary, filed a certificate of possession and a petition for confirmation as receiver of Marian Bank in the Court of Common Pleas of Philadelphia County. (D.I.51, Exs.1, 2) The court confirmed the Secretary as the Receiver [FN2] and authorized the Secretary to "sell and transfer to The Marian State Bank the assets and liabilities set forth in and pursuant to the terms of the Purchase and Assumption Agreement entered into between the [Secretary] and The Marian State Bank...." (D.I.51, Ex. 3)

> FN2. For the purposes of this opinion, the terms "Secretary" and "Receiver" shall be used interchangeably.

The Purchase and Assumption Agreement ("P & A Agreement"), executed on April 19, 1992, provided for the transfer, sale and/or assumption of certain assets, deposits, and other liabilities of Marian Bank to The Marian State Bank, a new state-owned bank. (D.I.114, Ex. 2) In particular, the P & A Agreement provided that several contracts for the provision of services to Marian Bank be transferred and assumed by The Marian State Bank:
With respect to those contracts listed on the Schedule of Contracts (Schedule D) attached hereto and made part hereof (the "Contracts"), providing for the rendering of services by or to [Marian Bank], existing as of [the close of business on April

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

17, 1992], [The Marian] State Bank agrees to give the Receiver, within thirty (30) days of [April 17, 1992], written notice specifying whether it elects to assume the Contracts.... [The Marian] State Bank shall be deemed to have assumed every Contract for which no such notification is timely made. The Receiver agrees to assign, transfer, convey and deliver to [The Marian] State Bank all rights, title and interest of the Receiver, if any, in and to any Contracts [The Marian] State Bank elects to assume hereunder.

**\*3** (D.I. 114, Ex. 2 at 6) Marian Bank's agreement relating to its participation in the MAC ATM network is not identified in "Schedule D". (D.I. 51, Ex. 4 at 14-17) On Monday, April 20, 1992, The Marian State Bank opened for business at the location previously used by Marian Bank.

On May 19, 1992, The Marian State Bank sent a letter to the Secretary stating:
[P]lease be advised that The Marian State Bank does not elect to assume and hereby disaffirms the following contracts:
....
ATM-MAC Agreement expires November 1992....

(D.I.114, Ex. 3) The letter also provided:As of this date, The Marian State Bank has not received a full copy of the Purchase and Assumption Agreement to include all applicable schedules. Very little of the above contract information was received from the FDIC on April 23, 1992. If the schedule from the Receiver includes contracts not on the list received at closing, or if any more additional leases and contracts are discovered, the bank reserves the right to disaffirm any contract it deems to be burdensome within 30 days from receipt of information.

(D.I.114, Ex. 3)

In transferring deposits from Marian Bank to The Marian State Bank, the Secretary sought FDIC (Federal Deposit Insurance Corporation) insurance for the new state-owned bank. Accordingly, "the P & A [A]greement provided that [The Marian] State Bank assume the first $100,000 of each depositor's deposits in Marian Bank."*See Hargrove v. Ehigner,* 161 Pa.Cmwlth. 306, 638 A.2d 282, 283

(Pa.Commw.Ct.1994). "Deposits over $100,000 [ ] remain[ed] in Marian Bank."*Id.* On April 20, 1992, The Marian State Bank entered into an agreement with the FDIC for the insurance and, as stated above, opened for business. *Id.*

**B. Litigation Relating to The Receivership Action**

In response to the Secretary's actions, a number of excess depositors (i.e., depositors with accounts that exceeded $100,000) and creditors filed two class action lawsuits relating to the deposits over $100,000 that remained in Marian Bank. *See Hargrove,* 161 Pa.Cmwlth. 306, 638 A.2d 282. The two lawsuits were consolidated with the receivership action in the Common Pleas Court of Philadelphia County. The court certified a class of (1) all depositors with deposits in excess of $100,000 in Marian Bank as of April 17, 1992, and (2) all creditors, other than depositors, of Marian Bank as of April 17, 1992, who filed proof of their claims with the Secretary. *Id.* at 310. The Secretary appealed the trial court's decision, arguing that certification of the class deviates from the procedure set forth in the Pennsylvania banking statutes. *Id.* at 311. An intermediate appellate court agreed with the Secretary and reversed the trial court's decision. While the class action plaintiffs sought leave to appeal this decision, the parties entered into settlement negotiations.

**C. Final Account and Settlement Agreement**

The settlement negotiations resulted in the parties entering into a Final Account and Settlement Agreement ("F & S Agreement"). (D.I.99, Ex. 2) Under the terms of the F & S Agreement, an "Asset Management Committee" (the "Committee") was created "for the purpose of supervising further collection and liquidation of Assets." (D.I. 99, Ex. 2 at 17) The Committee consists of three individuals: (1) one excess depositor recommended by counsel for the class; (2) a person recommended by the Secretary; and (3) one class member selected by the court. (D.I. 99, Ex. 2 at 34) The Committee members selected by class counsel and the Secretary must have the approval of the court.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 4

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

(D.I. 99, Ex. 2 at 34) If a Committee member resigns, a replacement will be selected by the remaining committee members and must also be approved by the court. (D.I. 99, Ex. 2 at 34) The F & S Agreement provides that the Committee's actions "with respect to [the] collection of assets and [the] compromise of claims shall be determined by majority vote of the Committee." (D.I. 99, Ex. 2 at 35)

**\*4** The F & S Agreement defines the "class" of settling plaintiffs as "all Excess Depositors and other creditors, including trade creditors, of [ ] Marian Bank as of April 17, 1992 [ ] who have timely filed proofs of their claims with the Secretary. ..." [FN3] (D.I.99, Ex. 2) Counsel for the class is defined as "the law firms of Spector, Gadon & Rosen and Berger & Montague." (D.I.99, Ex. 2) The term "Assets" is defined by the F & S Agreement as including "all claims and causes of action owned by the Secretary as Receiver except those listed on Exhibit E ('the Claims')." [FN4] (D.I. 99, Ex. 2 at 16) (emphasis added).

> FN3. The F & S Agreement excluded from the class individuals who had been partners of Marian Bank, as well as their relatives and related individuals or entities. (D.I. 99, Ex. 2 at 17)

> FN4. Although Exhibit E was not included in the record, all parties have asserted that the excluded claims and causes of action are irrelevant to the issues in the present motions. (D.I. 106 at 11; D.I. 98 at 8)

The F & S Agreement provided that, as soon as practicable, the Committee was to "employ an asset management and collection firm ('Asset Manager') for the purposes of continuing to collect and liquidate the Assets and to submit to the Asset Manager for collection ... for the benefit of the Class." (D.I. 99, Ex. 2 at 26) The selection of the Asset Manager was left to the court after consultation with the Secretary and class counsel. (D.I. 99, Ex. 2 at 26) The F & S Agreement stated that "[t]he assets to be collected by the Asset Manager shall only be the Assets, as defined herein,

excluding cash and cash equivalents." (D.I. 99, Ex. 2 at 26) The Asset Manager is also directed to report regularly "and be subject to the direction of [] the Asset Management Committee." (D.I. 99, Ex. 2 at 27)

After hearings and notice to all interested parties, the court approved the F & S Agreement on December 15, 1994. The court did not modify the terms of the agreement except for some provisions relating to the payment of attorney fees to the two law firms identified as class counsel. (D.I.99, Ex. 3) In the order approving the F & S Agreement, the court certified a class "for settlement purposes only. " (D.I. 99, Ex. 3 at 2) The court's order also appointed and identified three individuals as the Committee "for the purposes of collecting the balance of Assets of the Marian Bank for the benefit of the Class, to the extent" specified in the F & S Agreement. (D.I. 99, Ex. 3 at 5)

**D. Asset Management Committee Agreement**

The Committee is governed by the Asset Management Committee Agreement ("AMC Agreement"), which was entered into by the three Committee members. (D.I.99, Ex. 4) The AMC Agreement incorporated the definition of the term " Assets" as it is defined in the F & S Agreement. (D.I. 99, Ex. 4 at 2) The AMC Agreement provides that all actions by the Committee requires two affirmative votes of the three Committee members. Section 2.1 of the AMC Agreement places certain limitations on the Committee:
The Committee shall take no action pursuant to this Agreement unless and until this Agreement is approved by the Court. The Committee shall carry out the purposes of the [F & S Agreement] and the directions contained herein, and shall not at any time, enter into or engage in any business, and no part of the Assets or proceeds, revenue or income therefrom shall be used or disposed of by the Committee in furtherance of any business. This limitation shall apply irrespective of whether the conduct of any such business is deemed by the Committee to be necessary or proper for the conservation and protection of the Assets.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                  Page 5

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

**\*5** (D.I. 99, Ex. 4 at 2-3) Subject to the above limitations, the AMC Agreement enumerated specific powers and responsibilities of the Committee, including the following:(e) To do and perform any acts or things necessary or appropriate for the collection and maximizing the present value of and conservation and protection of the Assets, including acts or things necessary or appropriate to maintain Assets held by the Committee pending sale or other disposition thereof or distribution thereof to the Class, and in connection therewith to employ such agents, including counsel, accountants, experts, advisors, or other persons, and to confer upon them such authority as the Committee in their discretion may deem expedient, and to pay reasonable compensation thereof;

....

(g) To institute, join, or defend actions or declaratory judgments or other actions and to take such other action, including settlement of any such action on any terms deemed reasonable by the Committee in their discretion, in the name of the Committee, the Committee in their discretion may deem necessary or desirable to enforce any instruments, contracts, agreements, or causes of action relating to or forming a part of the Assets;

(h) To cancel, terminate, or amend any instruments, contracts, or agreements relating to or forming a part of the Assets, and to execute new instruments, contracts, or agreements, notwithstanding that the terms of this Agreement, provided that no such new instrument, contract, or agreement shall permit the Committee to engage in any activity prohibited by Section 2.1 of this Agreement;

....

(m) To perform any act authorized, permitted, or required under any instrument, contract, agreement, or cause of action relating to or forming a part of the Assets, whether in the nature of an approval, consent, demand, or notice thereunder or otherwise, unless such act would require the consent of the Class or the approval of the Court in accordance with the express provisions of this Agreement;

....

(D.I. 99, Ex. 4 at 4-6) The court approved the AMC Agreement on February 17, 1995, stating that the agreement is binding on all members of the class. (D.I.99, Ex. 5)

### E. Asset Management Agreement

The relationship between the Committee and the Asset Manager is governed by the Asset Management Agreement ("AM Agreement"). (D.I.99, Ex. 6) The AM Agreement contains a section entitled "Assets Subject to Agreement" that defined the "initial pool of assets," "additional assets," and "excluded assets." (D.I. 99, Ex. 6 at 3) The initial pool of assets consisted of loans, collateral and proceeds securing the loans, and real estate. (D.I. 99, Ex. 6 at 3) The loans and real estate are specifically identified in schedules attached to the AM Agreement. Additional assets consist of assets added by the Committee with the written consent of the Asset Manager. All additional assets must be specifically dated and identified in schedules which list the initial pool of assets. (D.I. 99, Ex. 6 at 3) Excluded assets are defined as any asset that the Asset Manager designates as excluded from the pool of initial assets. (D.I. 99, Ex. 6 at 3) The Asset Manager must designate whether an asset is excluded within sixty days from the date the AM Agreement becomes effective. (D.I. 99, Ex. 6 at 3)

**\*6** The duties and responsibilities of Asset Manager are also provided for in the AM Agreement. (D.I. 99, Ex. 6 at 4) The Asset Manager's duties are specified in the AM Agreement as follows:
Asset Manager's duties under this Agreement generally are to provide customary asset management, asset recovery and loan servicing services for the Assets, to prepare Asset Management and Disposition Plans ("AMDPs") for such Assets, and to manage, dispose, collect, and/or resolve such Assets in accordance with the AMPDs and the provisions of this Agreement.

(D.I. 99, Ex. 6 at 4) The Asset Manager's fiduciary duty is specified as follows:Asset Manager shall at all times act in good faith and in the best interest of the Class with respect to the Assets. Asset Manger shall carry out its obligations hereunder in accordance with normal standards and practices of the real estate asset management, asset recovery and commercial loan servicing industries, as may be applicable in the circumstances. Asset Manager shall conduct itself as a fiduciary of the Committee and the Class with respect to this Agreement and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Assets, subject to the direction of the Committee, the terms and conditions of this Agreement, and the terms and conditions of the Settlement Agreement. As such, Asset Manger shall conduct itself in a prudent manner and shall act consistent with the best interests of the Class and the Committee with respect to the liquidation and collection of the Assets....

(D.I. 99, Ex. 6 at 4) On August 31, 1995, the court approved the AM Agreement and designated WEARCO, Inc. as the Asset Manager. (D.I.99, Ex. 6) The court stated that WEARCO is to " administer, collect and liquidate the Impounded Assets, for the benefit of the Class of Excess Depositors, pursuant to the terms and conditions of the Asset Management Agreement." (D.I.99, Ex. 6)

### F. Marian Bank's Claims

On March 31, 1995, the Court of Common Pleas issued an order granting the Committee leave to file suit on behalf of Marian Bank. The court's order stated:

[T]he Asset Management Committee is granted leave to designate counsel to institute such suits and/or to pursue and settle such claims in the name of Marian Bank as it deems necessary and appropriate to generate funds or value from any assets, loans, contracts, rights, claims and any and all other types and forms of causes of action of whatever nature, which were transferred to the Asset Management Committee for the benefit of the Class from the Receiver of Marian Bank under the Court ordered and approved Settlement Agreement.

(D.I.99, Ex. 5) In accordance with this order, the Committee filed a complaint against the defendants alleging antitrust violations relating to the MAC ATM network. (D.I.1, 110)

The complaint defines two separate markets: (1) an ATM Network Processing market, and (2) an ATM Network Access market. (D.I. 110 at 7) ATM Network Processing (also called ATM driving) is defined in the complaint as follows:
*7 [P]roviding the data processing services and telecommunications facilities and services used:

1. to operate, monitor, and support the operation of ATMs deployed by a depository institution;
2. to connect the ATMs deployed by a depository institution to that institution's deposit authorization records, for authorization and confirmation of " on-us transactions," and the record-keeping and other functions related to such transactions; and
3. to connect the ATMs deployed by a depository institution to one or more branded ATM networks for authorization and confirmation of "on-others transactions," and the record-keeping and other functions related to such transactions.

(D.I. 110 at 6) The complaint also explains that ATM network processing "can be performed in the facilities of the ATM switch, a depository institution's own facilities, or in the facilities of a data processing service organization." FN5 (D.I. 110 at 6-7) Although "ATM network access" is not specifically defined in the complaint, the term " Regional ATM network access" is defined as " access to the ATM network as previously defined, and constitutes one of the relevant product/service markets herein." FN6 (D.I. 110 at 6)

> FN5. An "ATM switch" is defined in the complaint as "a telecommunications and data processing facility used to receive and route transactions from ATMs or ATM processors to data processing facilities used by depository institutions to authorize ATM transaction requests." (D.I. 110 at 5) A "MAC switch" is defined as "an ATM switch operated by or on behalf of, or providing such functionality for branded ATM network access to, MAC or any successor branded ATM network controlled by defendants." (D.I. 110 at 5)

> FN6. "ATM network" is defined in the complaint as "an arrangement whereby more than one ATM and more than one depository institution (or the deposit records of such depository institutions) are interconnected by electronic or telecommunications means, to one or more computers, processors or switches for the purpose of providing ATM services to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 7

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

depositors and credit card customers of the member depository institutions." (D.I. 110 at 6) "MAC" is defined as "the branded ATM network owned, controlled and operated by EPS since December 1992 and previously owned and operated by CoreStates." (D.I. 110 at 6)

As noted above, plaintiff's complaint sets forth five separate counts. Count I, asserted against defendants CoreStates, PNC, and Banc One, alleges a conspiracy to restrain trade in violation of § 1 of the Sherman Act. Count II, asserted against all named defendants, alleges a conspiracy to impose an illegal tying arrangement to tie ATM network access to ATM network processing in violation of § 1 of the Sherman Act. Count III, asserted against all named defendants, alleges monopolization and attempted monopolization in the markets for ATM network access and ATM network processing in violation of § 2 of the Sherman Act. Count IV, asserted against all defendants, alleges a conspiracy to monopolize the market for ATM network access. Finally, count V alleges that all defendants violated the Bank Holding Act, 12 U.S.C. § 1971 *et seq.,* by tying ATM network access to ATM network processing. As noted above, the court's earlier memorandum opinion and order dismissed the complaint against EPS entirely and dismissed counts III and IV (the non-conspiracy counts) against defendants PNC and Banc One. (D.I. 71, 72)

The five counts in plaintiff's complaint all relate to the MAC practice of conditioning the purchase of ATM processing with the purchase of ATM network access (i.e., "no-third party processing" rule).[FN7] (D.I. 110 at 12) As a general matter, there is no dispute that until October 1994, EPS (and previously CoreStates) had implemented a " no-third party processing" rule in operating the MAC ATM network. (D.I. 47, Ex. 11 at 7,8) The " no-third party processing" rule required MAC members to either perform their own ATM processing or obtain it through MAC as part of a single ATM network product. Plaintiff alleges that this practice reduced competition in the markets for ATM network access and ATM network processing, which allowed defendants to overcharge MAC member institutions.

FN7. In October 1994, the United States and EPS entered into a Consent Decree and Final Judgment in which EPS agreed, *inter alia,* to stop using the "no-third party processing" rule as a business practice. *United States v. Electronic Payment Services, Inc.,* Civ. No. 94-208, 1994 WL 730003 (D.Del. Oct.14, 1994).

**\*8** From 1986 until April 17, 1992, Marian Bank was a full service member of the MAC ATM network. (D.I. 106 at 16) As a member of the MAC ATM network, Marian Bank paid fees pursuant to a 1989 MAC participation agreement ("Marian Bank Participation Agreement"). (D.I. 51, Ex. 1 at 2) These fees were identified in the invoices as different "components" and charged monthly. The larger fee components included a minimum fee of $600.00 for "processor fees for card management services" and a minimum fee of $1000.00 for " transaction fees." (D.I. 51, Ex. 1 at 3) Marian Bank also paid $175.00 for "ATM operation fees" since it owned and operated one ATM. (D.I. 51, Ex. 1 at 3) The "Marian Bank" antitrust claims are based on the overcharging of MAC fees for the period from April 21, 1990 to April 17, 1992. (D.I. 110 at 8; D.I. 98 at 13; D.I. 99, Ex. 7 at 28-30)

### G. The Marian State Bank's Claims

According to the Committee, "The Marian State Bank" antitrust claims are based on the same overcharging of MAC fees during the period from April 20, 1992 to April 17, 1994. (D.I. 106 at 2) On April 20, 1992, the first day it opened for business, The Marian State Bank started its participation in the MAC ATM network on essentially the same terms as the former Marian Bank. The Marian State Bank also continued to operate the former Marian Bank's ATM. Accordingly, The Marian State Bank paid essentially the same monthly fees that the former Marian Bank paid for its participation in the MAC ATM network. Indeed, the MAC invoices after August 1992 are addressed to the former Marian Bank. (D.I.99, Exs.8-10)

As noted above, The Marian State Bank specifically

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 8

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

disaffirmed Marian Bank's MAC-ATM Agreement in a letter sent to the Secretary on May 19, 1992. (D.I.114, Ex. 3) On September 22, 1992, The Marian State Bank sent an application to the Pennsylvania Department of Banking regarding its desire to abandon the only ATM it was operating. (D.I.113) The Marian State Bank explained that abandonment of the ATM would result in significant savings. (D.I.113) The Marian State Bank also stated that it would continue to issue ATM cards so that its customers could use other ATMs in the MAC network. (D.I.113) The Department of Banking authorized The Marian State Bank to abandon its ATM on December 21, 1992. (D.I.113)

On December 24, 1992, The Marian State Bank informed the lessor of the ATM space, the armored car service, a protection and monitoring service, and MAC about its decision to abandon its operation of the ATM. (D.I.113) The Marian State Bank stated that it planned to cease operating the ATM effective January 29, 1993. (D .I. 106, Ex. F; D.I. 113). In its letter to MAC, The Marian State Bank expressed its desire to continue as a MAC member and an insurer of MAC ATM cards. (D.I.106, Ex. F)

On January 29, 1993, The Marian State Bank informed the Secretary that it had satisfied all applicable requirements in connection with its abandonment of the ATM. (D.I.113) MAC invoices after January 1993 do not contain the monthly $175.00 "terminal operation fee." (D.I.99, Ex. 9) In April 1993, The Marian State Bank settled its account with the leasing company that owned the ATM and the ATM's related equipment. (D.I.113)

*9 On February 12, 1993, MAC sent a letter addressed to the former Marian Bank regarding a new MAC agreement. (D.I.106, Ex. G) The Marian State Bank responded to this letter on February 18, 1993, stating that it had "numerous questions concerning the new MAC agreement sent to The Marian State Bank."(D.I.106, Ex. F) In April 1993, The Marian State Bank apparently executed a MAC Agreement.[FN8] (D.I. 106, Ex. G; 62 at C012) According to plaintiff, although The Marian State Bank ceased operating its ATM in January 1993,

MAC continued to charge it a $1600.00 minimum fee throughout the period from April 1992 to April 1994. (D.I. 106 at 19)

> FN8. The Committee points to a MAC document which appears to indicate that a MAC contract in the name of "Marian Bank" was issued on February 12, 1993 and became effective on April 15, 1993. (D.I. 62 at C012)

**H. Assignment Between Marian Bank and Royal Bank**

On September 26, 1994, The Marian State Bank was acquired by Knoblauch State Bank. (D.I.99, Ex. 12) In a letter to the Committee's attorneys, dated May 12, 1995, Knoblauch State Bank asserted that claims relating to "time periods subsequent to April 17, 1992 [were] [ ] [The] Marian State Bank's (now Knoblauch State Bank) assets." (D.I.99, Ex. 11) Knoblauch explained that it believed that The Marian State Bank owned the lease on the ATM since The Marian State Bank had (1) continued to use the ATM, (2) paid the rental fees for the ATM; and (3) filed an application to close the ATM. (D.I.99, Ex. 11)

On July 24, 1995, the Royal Bank of Pennsylvania ( "Royal Bank") then acquired all the outstanding shares of Knoblauch State Bank. *See Knoll v. Butler,* 675 A.2d 1308 (Pa.Commw.Ct.1996).[FN9] (D.I.99, Ex. 12) Royal Bank also asserted that it had an interest in the post-April 17, 1992 claims relating to The Marian State Bank. The Committee's attorneys entered into negotiations with Royal Bank to resolve this dispute and the alleged deficiencies raised by defendants. The negotiations resulted in an "Assignment of Claims, Rights [[[,] Interests and Causes of Action" ("Assignment") dated November 7, 1996. (D.I.99, Ex. 12) The Assignment was entered into by the Committee (on behalf of Marian Bank) and Royal Bank of Pennsylvania. (D.I.99, Ex. 12) The Assignment provides for the following:

> FN9. The escrow arrangement in which Royal acquired Knoblauch State Bank was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 9

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

unsuccessfully challenged by the Treasurer of the Commonwealth of Pennsylvania. *See Knoll,* 675 A.2d 1309.

1. In consideration for One Dollar ($1.00) and other good and valuable consideration, including but not limited to, the consideration set forth in paragraph 2 below, the receipt and sufficiency of which is hereby acknowledged, Royal hereby conveys, sells, assigns and transfers to the Marian Committee all rights, claims, interests and causes of action of Marian Bank arising out of or in any way related to the Marian MAC Contracts or the Marian ATM which may have been transferred to [The] Marian State Bank, if any, and all rights, claims, interests and causes of action of [The] Marian State Bank arising out of or in any way related to the Marian MAC Contracts or the Marian ATM, which it may now have or have had under the antitrust laws of the United States of America against any of the defendants named in *Marian Bank v. EPS,* C.A. No. 95-614 (hereinafter the "Litigation") with full right to maintain an action thereon to settle, compromise or reassign such cause of action, if any, and give a release of such claims in the name of Royal, [The] Marian State Bank, Marian Asset Management Committee, or Marian Bank, in full discharge of the liability thereunder.

*10 2. In consideration for the assignment set forth in paragraph 1 above, the Marian Committee and Marian Bank hereby agrees to pay to Royal fifty percent (50%) of any recovery by the Marian Committee and/or Marian Bank arising from the Litigation, the Marian MAC Contracts or the Marian ATM, whether that recovery is received by the Marian Committee or Marian Bank through verdict or settlement.

(D.I. 99, Ex. 12 at 2-3)

According to plaintiff, the Assignment "was effectuated to maximize and protect the 'assets' of Marian Bank so that a class action could be pursued for the entire class period, and recovery had." (D.I. 106 at 21) Wendell C. Ehinger, the president of WEARCO, Inc. (the Asset Manager) testified that he was present when the Committee met to discuss the Assignment. (D.I. 99, Ex. 7 at 22) Mr. Ehinger stated that the Assignment was "ultimately started

by counsel." (D.I. 99, Ex. 7 at 22) According to Mr. Ehinger, counsel for the Committee asked the members to sign the Assignment. (D.I. 99, Ex. 7 at 24) Mr. Ehinger explained that he and the Committee members discussed the business reasons for signing the Assignment:

Q. Did you say anything about the assignment at the meeting?
A. Yeah. We discussed it and, you know, the reasons for it, and you know, basic business decision ....
A. .... we looked at the pros and cons of, you know, why should we do it.

(D.I. 99, Ex. 7 at 23-24) After learning about Royal's assertion that it had an interest in the post-April 17, 1992 claims, the Committee members and Mr. Ehinger considered pursuing the lesser period of time. Mr. Ehinger, however, explained the business reasons for signing the Assignment:A. ... It's a two-step process. They [Royal] had rights-they gave us all the rights and then we agreed to give them 50 percent of whatever the total we got, whether it was from our claim or their claim. They merged at that point.
Q. And I think you indicated you were-we talked about the pros and cons, you were taking a shot that the addition of that would outweigh the 50 percent that you were giving out. Correct?
A. We really didn't know and probably don't know and won't know until the case is decided how that sorts out. But from a business point of view, it seemed like a not unreasonable approach to take.
Q. If [ ] [The] Marian State Bank portion of the recovery is less than the 50 percent of the Marian Bank portion of recovery that you're giving away or providing in consideration for [The] Marian State Bank claim, the excess depositors and trade creditors of [the] former Marian Bank will have not benefited from this assignment. Correct?....
A. From a purely economic point of view, they would achieve less than they would have if it was the other way around. But by the same token, if it enables us to collect on the suit because it solved the problem, the other problem, then it would clearly-even getting less would be better than getting you know, a lot less. And again, that's something we made a business decision that's worth whatever chance that may be.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

**\*11** (D.I. 99, Ex. 7 at 56-58) In deciding to sign the Assignment, the Committee members relied upon counsel's advice. (D.I. 99, Ex. 7 at 60) Mr. Ehinger also stated that he considered this decision "more of a legal decision than a business decision." (D.I. 99, Ex. 7 at 60) Mr. Ehinger testified that he did not have any discussions with trade creditors or excess depositors of Marian Bank (except for the three Committee members who are excess depositors) regarding the Assignment. (D.I. 99, Ex. 7 at 35)

Thomas J. Baker, a member of the Committee also explained the business reasons for entering into the Assignment:

13. In the collection or liquidation of any portfolio of assets, causes of action and contract rights, you must be flexible. There is give and take in connection with maximizing the value. In this matter, a reasonable and valid decision was made to trade 50% of our potential claim to get 50! of the total of two claims, and at the same time remove a dispute to our post April 17, 1992 assets which was being asserted by [The] Marian State Bank. This was not only sound logic, but permitted under all our agreements and court orders and was clearly in the best interests of both the depositors and creditors of the former Marian Bank, as well as the potential Class and the victims of Defendant's wrongdoing.

14. This decision was made to overcome a challenge by the Defendants to try to prevent the pursuit of this litigation when it was obvious that, unless this Plaintiff was permitted to proceed on its post April 17, 1992 claims, CoreStates, PNC, Bank One and EPS could be in a position to get away with not answering in damages (and thereby actually profiting for the unlawful conduct....

(D.I. 106, Ex. B at 7-8) Based on the terms of the Assignment, the Committee argues that it has obtained antitrust claims for the entire statutory period. According to plaintiff, by obtaining the claims for the entire statutory period, the Committee acted "to protect and maximize its ability to recover in this lawsuit" and that its action did not breach any fiduciary duty to the settlement class of excess depositors and trade creditors. (D.I. 106 at 26)

### III. DISCUSSION

As noted above, two motions are presently before the court: (1) defendants' motion for partial summary judgment on the asserted post-April 17, 1992 claims and (2) plaintiff's renewed motion for class certification. The court shall address defendants' motion first.

#### A. Defendants' Motion for Summary Judgment

#### 1. Summary judgment standard

Summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ .P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its initial burden, the nonmoving party "must come forward with ' specific facts showing that there is a genuine issue for trial.' " *Id.* at 587. " Facts that could alter the outcome are 'material,' a nd disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corn. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 11

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

favorable to the party opposing the motion." *Pennsylvania Coal Assn. v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995) (citation omitted).

**\*12** Defendants argue that summary judgment for the post-April 17, 1992 claims is warranted because the Committee lacks standing to assert a third party's claims through the assignment of the post-April 17, 1992 claims.[FN10]

> FN10. There is apparently no dispute that the assignment of antitrust claims complies with the Third Circuit's opinion in *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425 (3d Cir.1994) (holding that, under controlling federal law, antitrust claims are assignable if they are specifically identified in the assignment of such claims).

### 2. Analysis

This court determined previously that plaintiff did not have standing to pursue post-April 17, 1992 claims.[FN11] Plaintiff has amended its complaint in an attempt to overcome the court's objection and bridge the gap between its demise and the termination of the allegedly wrongful conduct. Plaintiff relies on the Assignment as the means to accomplish this goal. Defendants argue that the Assignment is invalid and unenforceable and, therefore, the Committee still lacks authority to pursue any post-April 17, 1992 claims. As support for their position, defendants cite to the general proposition that a party is not permitted to take an action for which it has no authority.[FN12]

> FN11. Plaintiff argues to the contrary, based on the May 19, 1992 letter from The Marian State Bank disaffirming the MAC-ATM contract. Given the continued use by and payment of such services by The Marian State Bank, the assertion of post-April 17, 1992 claims by both Knoblauch State and Royal Banks, and the absence of any evidence of record

that the Receiver was ever held liable for any post-April 17, 1992 obligations, the court is not inclined to change its previous ruling.

> FN12. As examples of this general proposition, defendants cite cases involving trustees, special masters, contracts, and corporations. *See e.g., Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (holding that chapter 10 trustee did not have standing to assert, on behalf of holders of debentures issued by debtor, claims against indenture trustee); *Williams v. California First Bank,* 859 F.2d 664 (9th Cir.1988) (holding that a trustee of an estate lacked standing to bring suit against bank on behalf of debtor's creditors, even though creditors assigned to trustee their claims); *Equal Employment Opportunity Comm'n v. Local 638,* 81 F.3d 1162 (1st Cir.1996) (holding that a special master appointed by a magistrate does not have any more authority than that which Congress granted to magistrates); *Orange v. District of Columbia,* 59 F.3d 1267 (D.C.Cir.1995) (holding that contracts executed in excess of what was authorized are void and unenforceable); *Ministar Acquiring Corp. v. AMF, Inc.,* 621 F.Supp. 1252 (S.D.N.Y.1985) (holding that target corporation's defensive acts were illegal or ultra vires).

With respect to this case, the Committee's powers are governed by court-approved documents, the interpretation of which must be consistent as to each other within the context of the circumstances which required court intervention in the first instance. *See generally Anderson v. Stephens,* 875 F.2d 76, 79 (4th Cir.1989). The Committee was given the specific authority to institute lawsuits in the name of Marian Bank by the March 31, 1995 State court order. The order describes the Committee's authority in terms of generating funds from any claims and causes of action "which were transferred to the Asset Management Committee for the benefit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 12

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

of the Class from the Receiver of Marian Bank...."
This is not broad language. The Committee was
not given a free hand to pursue third party claims
and causes of action in order to generate funds for
the benefit of the class. The Committee certainly
was not given specific authority to institute a
lawsuit whereby counsel for Marian Bank would
also be representing hundreds of unrelated, diverse
financial institutions. In sum, the Committee was
confined by the language of the court order to the
context of the receivership proceeding.

Plaintiff points to § 2.2(g) of the AMC Agreement
which empowers the Committee "to institute, join
or defend actions ... and to take such other action ...
deemed reasonable by the Committee .... in the
name of the Committee ... to enforce any
instruments, contracts, agreements, or causes of
action relating to or forming a part of the Assets...."
(D.I. 106 at 28; 99, Ex. 4 at 5) Section 2.2(g),
however, specifically refers to actions taken in the
name of the Committee and does not refer to actions
taken in the name of Marian Bank. Moreover, the
word "Assets" is a defined term in the F & S
Agreement and again limits the Committee's
activities to pursuing those "claims and causes of
action owned by the Secretary as Receiver...." (D.I.
99, Ex. 2 at 16) Finally, § 2.2(m) of the AMC
Agreement empowers the Committee to perform "
any act authorized, permitted, or required under any
cause of action relating to or forming part of the
Assets ... unless such act would require the consent
of the Class or the approval of the Court...." (D.I.
99, Ex. 4 at 6) The only court approval obtained is
that described in the March 31, 1995 order, which
limits the Committee's powers as described above.
There is nothing in the record to indicate
that such sweeping authority as plaintiff claims was
ever given or even contemplated on behalf of the
class of excess depositors and creditors by the State
court or the Receiver. Because the court has not
been persuaded that plaintiff has the authority to
represent third-party claims and causes of action in
a class action lawsuit as contemplated by plaintiff,
[FN13] the court finds the Assignment unenforceable.

FN13. In the years since this litigation was
filed, the Committee apparently has not

attempted to clarify its authority to pursue
its contemplated role as class
representative with either the class it
presently represents or the State court.
Neither has Royal Bank (or any other
financial institution) applied for leave to
intervene as a class representative.

**B. Plaintiff's Motion for Class Certification**

*13 Since the court has found the Assignment
invalid, plaintiff seeks certification of a class of all
depository institutions in Delaware, Pennsylvania,
New Jersey, West Virginia, and Ohio that
participated in the MAC ATM network and utilized
defendants' ATM processing services, excluding
defendants and their respective parents, subsidiaries
and affiliates for the period April 17, 1990 through
December 3, 1992.[FN14] (D.I. 110 at 20; 80 at
5-6) Plaintiff seeks to represent this proposed class
in asserting antitrust claims relating to defendants'
conduct in the markets for ATM network
processing and ATM network access. (D.I. 80 at 5)

FN14. As Marian Bank has noted, a
plaintiff may represent a class of
purchasers which purchased both before
and after the plaintiff as long as the
plaintiff has standing against the proposed
defendant. (D.I. 80 at 6 n. 5) *See e.g.,
Gentry v. C & D Oil,* 102 F.R.D. 990, 495
(W.D.Ark.1984) (holding that plaintiff's
claims do not have to extend throughout
the class period). There is no evidence of
record indicating, however, that plaintiff
has standing to assert claims past its
demise on April 17, 1992 and, therefore,
its proposed date of December 3, 1992 is
rejected.

The Third Circuit, in *In re General Motors Corp.
Pick-Up Truck Fuel Tank Products Liability
Litigation* ("GM Trucks"), identified the basic
purposes served by class actions in our legal system:
One of the paramount values in this system is
efficiency. Class certification enables courts to
treat common claims together, obviating the need
for repeated adjudications of the same issues. [ ] ....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 13

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Class actions achieve "the protection of the defendant from inconsistent obligations, the protection of the interests of absentees, the provision of a convenient and economical means for disposing of similar lawsuits, and the facilitation of the spreading of litigation costs among numerous litigants with similar claims." [ ]

55 F.3d 768, 783-784 (3d Cir.1995) (citations omitted). The use of class actions to spread litigation costs among numerous litigants with similar claims has been justified because, *inter alia,*" aggrieved persons may be without any effective redress unless they may employ the class-action device." *Id.* at 784 (quoting *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)). In noting these benefits of class actions in *GM Trucks,* the Third Circuit also identified concerns and problems related to class actions:[In a class action, the] absentees' interests are being resolved and quite possibly bound by the operation of res judicata even though most of the plaintiffs are not the real parties to the suit. The protection of the absentees' due process rights depends in part on the extent the named plaintiffs are adequately interested to monitor the attorneys (who are, of course, presumed motivated to achieve maximum results by the prospect of substantial fees), and also on the extent that the class representatives have interests that are sufficiently aligned with the absentees to assure that the monitoring serves the interest of the class as a whole....
Another problem is that class actions create the opportunity for a kind of legalized blackmail: a greedy and unscrupulous plaintiff might use the threat of a large class action, which can be costly to the defendant, to extract a settlement far in excess of the individual claims' actual worth. Because absentees are not parties to the action in any real sense, and probably would not have brought their claims individually, [ ] attorneys or plaintiffs can abuse the suit nominally brought in the absentees' names....

*14 *Id.* at 784-785 (citations omitted and emphasis in original). Given these concerns and problems, the court has the obligation to act as in a sort of fiduciary of the absentees' interests, in a sort of fiduciary

capacity, by approving appropriate representative plaintiffs and class counsel." *Id.* at 784. The concerns were specifically considered in designing the procedural requirements for class certification contained in Federal Rule of Civil Procedure 23. *Id.* at 785. Based on the record, the court must make findings pursuant to the requirements set forth in Rule 23(a) and (b). *Id.* at 778; *see also Georgine v. Amchem Products. Inc.,* 83 F.3d 610, 625 (3d Cir.1996).

Subsection (a) provides that class certification is appropriate only if:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). With respect to the requirements under Rule 23(b), plaintiff seeks class certification under subsection (3). Under subsection (3), class certification is appropriate only if:the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). To obtain certification, plaintiff must establish that all four prerequisites of Rule 23(a) and the requirements of Rule 23(b)(3) are met. *Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994); Fed.R.Civ.P. 23(a) and (b). The court shall address these prerequisites and requirements *in seriatim.*

## 1. Numerosity

Plaintiff asserts that several hundred depository institutions can be identified as part of the class. (D.I. 46 at 18; 47, Ex. 16; 80 at 12) The court notes that, in their answering brief to plaintiff's renewed class certification motion (D.I.100), defendants do not contest the numerosity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 14

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

prerequisite. To the extent that defendants argue that joinder is not impracticable,[FN15] the court still finds in favor of plaintiff.

> FN15. In their first brief opposing class certification, defendants argued that joinder was not impracticable because the class members are sophisticated commercial entities capable of protecting their own interests. (D.I. 54 at 29)

"The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *see also* 7A Charles A. Wright, et al., *Federal Practice and Procedure,* § 1762, at 153 (1986) (hereinafter "Wright, et al.") Accordingly, there is no "magic number" that satisfies this requirement. *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989). Nonetheless, the impracticability of joining parties numbering in the hundreds or more are generally obvious and easily satisfy the numerosity requirement. See Herbert Newberg & Alba Conte, 1 *Newberg on Class Actions,* § 3.05, at 3-24 (3d ed.1992) (hereinafter " H. Newberg & A. Conte"). The focus of a court's inquiry is whether joinder of all class members is " impracticable," not whether joinder is impossible. H. Newberg & A. Conte, § 3.04, at 3-17; 7A Wright, et al., § 1762, at 159. A plaintiff need only make a showing of "strong litigational hardship or inconvenience...." *Id.; see* 7A Wright, et al., § 1762, at 159 (stating that class "representatives only need to show that it is extremely difficult or inconvenient to join all the members of the class").

*15 Plaintiff has established that joinder of all potential class members would involve hundreds of members. (D.I.47, Ex. 16) Furthermore, these potential class members are located throughout the five states identified in the complaint. Although some potential class members may be capable of bringing their own independent actions, the court finds that the practical difficulties of joinder weigh in favor of plaintiff given the large size and geographic diversity of the proposed class.

### 2. Commonality

Subsection (a)(2) requires that there exist " questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). This prerequisite is usually satisfied "if the named plaintiff[ ] share[s] at least one question of fact or law with the grievances of the prospective class." *Neal,* 43 F.3d at 56 (citations omitted). Since this prerequisite can be satisfied by a "single common issue, it is easily met.. .."*Id.*(citing H. Newberg & A. Conte, § 3 .10 at 3-50 (1992)); *see Georgine,* 83 F.3d at 627 (declining to establish a "high threshold for commonality"). Furthermore, the commonality prerequisite does not require that all class members share identical claims. *See Neal,* 43 F.3d at 56.

According to plaintiff, common questions of law and fact exist since its claims involve a common element: whether defendants engaged in certain practices in restraint of trade. (D.I. 46 at 20) As support, plaintiff cites several antitrust class action cases where commonality was satisfied. *See e.g., Weiss v. York Hosp.,* 745 F.2d 786, 805 (3d Cir.1984); *see also State of Minnesota v. United States Steel Corp.,* 44 F.R.D. 559, 556 (D.Minn.1968); *see also Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 795 (10th Cir.1970). Some common questions plaintiff has identified are as follows:
(1) Whether ATM network access and ATM network processing are two separate and distinct products;
(2) Whether defendants' contracts and MAC's rules required its customers to purchase ATM network processing from MAC;
(3) Whether the relevant markets are the market for regional ATM network access and ATM network processing;
(4) Whether defendants possess monopoly power in the relevant markets; and
(5) Whether defendants formed a combination or conspiracy in interstate commerce to monopolize or attempt to monopolize the relevant markets.

(D.I. 46 at 21). Defendants do not dispute that these questions are common to the proposed class. Given the low threshold for this prerequisite, *see Georgine,* 83 F.3d at 610, the court finds that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Page 15

plaintiff has established that its claims involve common questions of law and fact with the proposed class.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Similar to the commonality prerequisite, the typicality prerequisite does not require that the plaintiff's legal theories and factual circumstances be identical to those of the proposed class. *See Neal,* 43 F.3d at 56; *see also Hassine,* 846 F.2d at 177 (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985). "The typicality requirement is generally met if the named plaintiff[ ]'[s] claims arise from the same events and are based on the same legal theories as those of the absent class members." *Christians Mortgage Corp. v. Delaware Mortgage Bankers Assn.,* 136 F.R.D. 372, 379 (D.Del.1991).

*16 The typicality prerequisite serves to "assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented." *Neal,* 43 F.3d at 56 (citation omitted). Unlike commonality and numerosity, which evaluate the sufficiency of the class itself, " 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff." *Ha ssine v. Jeffes,* 846 F.2d 169, 177 n. 4 (3d Cir.1988). The Third Circuit has commented that "typicality is more akin to adequacy of representation" since "both look to the potential for conflicts in the class." *Georgine,* 83 F.3d at 632. The typicality inquiry, however, must nevertheless focus on whether the named plaintiff's "claims" or "defenses" are "typical," as provided for by Rule 23(a)(3). Accordingly, the typicality prerequisite "is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine,* 83 F.3d at 631 (citing *Neal,* 43 F.3d at 57).

Plaintiff's antitrust claims consist of (1) alleged conspiracies to restrain trade, impose a tie-in, and monopolize; (2) an alleged illegal tying arrangement; and (3) an alleged monopolization and attempted monopolization. Defendants argue that plaintiff's claims are atypical of the class because unique defenses exist.[FN16] According to defendants, plaintiff's claims are atypical of the class's claims because there exists the unique defenses of standing and lack of capacity as to Plaintiff. (D.I. 100 at 16-18) Defendants cite to their arguments relating to plaintiff's authority to assert post-April 17, 1992. Since unique defenses exist against plaintiff, defendants assert that class certification must be precluded.

> FN16. Defendants' arguments relating to conflicts and problems with classwide proof of certain required elements shall be addressed in discussing the adequacy of representation prerequisite and the predominance requirement.

Unique, dispositive defenses applicable to a named plaintiff may render its claims atypical. *See Zenith Lab., Inc. v. Carter-Wallace,* 530 F.2d 508, 512 (3d Cir.1976); *see* 5 James W. Moore, *Moore's Federal Practice,* ¶ 23.24[6], at 23-97 (3d ed.1997) (explaining that a unique defense that is central to the litigation precludes a finding of typicality). *But see, In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Securities Litigation,* 848 F.Supp. 527 (D.Del.1994) (holding that defendants' statute of limitations defenses are not unique to plaintiff and may be raised against all class members). As discussed above, the court has concluded that the Committee has not been given the authority to generate funds through the pursuit of third party claims and causes of action. Consistent with this conclusion, plaintiff has not and cannot satisfy the typicality prerequisite in Rule 23(a)(3).

### 4. Adequacy of Representation

Rule 23(a)(4) provides that a class action may be institute only if "the representative parties will fairly and adequately protect the interests of the class."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

Fed.R.Civ.P. 23(a)(4).
*17 The adequacy of representation inquiry has two components designed to ensure that absentees' interests are fully pursued. First, the interests of the named plaintiffs must be sufficiently aligned with those of the absentees. [ ] This component includes an inquiry into potential conflicts among various members of the class [ ] because the named plaintiffs' interests cannot align with those of the absent class members if the interests of different class members are not themselves in alignment. Second, class counsel must be qualified and must serve the interests of the entire class.

*Georgine,* 83 F.3d at 630. Defendants argue that plaintiff cannot adequately represent the class because (1) conflicts of interest are inherent in proving liability and (2) other conflicts exist based on plaintiff's unique status. The court shall address these arguments separately.

### (a) Conflicts in Proof of Liability

An antitrust plaintiff, which seeks treble damages under § 4 of the Clayton Act, must prove (1) an antitrust violation; (2) fact of damage; and (3) amount of damage. *See Yeager's Fuel. Inc. v. Pennsylvania Power & Light Co.,* 162 F.R.D. 471, 477 (E.D.Pa.1995) (citing, inter *alia alia, Weiss v. York Hosp.,* 745 F.2d 786, 805 (3d Cir.1984) and *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d Cir.1977)); *See also Christiana Mortgage Corp.,* 136 F.R.D. at 380. The " 'fact of damage' " element is part of the proof of liability and must be distinguished from proving the amount of damages after liability has been established." *Christiana Mortgage Corp.,* 136 F.R.D. at 380 (citing Bogosian, 561 F.2d at 454-456). In the present case, the main allegation against defendants is the alleged illegal tying of ATM network processing with ATM network access. Plaintiff asserts that this tying arrangement allowed defendants to charge "supracompetitive" prices for services in the ATM network processing market. In order for a class member to establish "fact of damage" in relation to this alleged violation, it must prove that the MAC fees it paid involved an illegal overcharge.

According to defendants, the MAC fees charged to each member institution are different depending on numerous factors. Since there are differences in fees charged, defendants assert that inherent conflicts exist relating to the proof of the alleged " overcharge" in MAC fees. The MAC fee schedule is explained in the declaration of Philip Valvardi, the Director of Client Relations for EPS. (D.I.55, Ex. 1)

The MAC fee schedule provides for three categories of MAC participants: (1) an "intercept processor," (2) an "authorization processor," and (3) a "full service participant." (D.I. 55, Ex 1 at 5-6) An intercept processor provides itself several services related to the ATM network, including operating its own ATMs and monitoring its own customer accounts. (D.I. 112 at 117-118) Since an intercept processor provides itself these services, it does not pay for card management services (processor fees), transaction fees, or ATM operation fees. (D.I. 55, Ex. 1 at 5; 112 at 118) An authorization processor also provides itself some services related to the ATM network. An authorization processor does not operate its own ATMs, but does provide for its own card management services. Accordingly, authorization processors do not pay fees for card management services (processor fees). (D.I. 55, Ex. 1 at 6; 112 at 119) Full service participants, like Marian Bank, pay fees to the MAC ATM network, which provides card management, transaction, and ATM operation services. (D.I. 55, Ex. 1 at 3-6)

*18 The MAC fee schedule also involves different fees depending on such factors as "the number of transactions, [the] number of cards outstanding, and the number of ATM machines operated by the participant financial institution in any given month." (D.I. 55, Ex. 1 at 6). Participants with more transactions, ATMS, and cardholders are charged lower fees. (D.I. 55, Ex. 1 at 6) In contrast, participants with a relatively small number of ATMs, cardholders, and transactions (like Marian Bank) are charged "minimum fees." (D .I. 55, Ex. 1 at 3; 106 at 16) MAC participants with a larger number of monthly transactions were not charged " minimum fees." (D.I. 55. Ex. 1 at 7)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 17

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

Other aspects of the MAC fee structure identified by defendants include the following factors: (1) participants that had been "grandfathered" because they had previously been participants of other networks are charged different fees; (2) after the formation of EPS, different fee schedules were created for "MAC west and "MAC west" portions of the ATM network; (3) participants pay " interchange" fees that are pass-through charges from one participant to another; and (4) fees were affected by participation in other regional and national ATM networks.

Defendants argue that the difference in fee schedules creates a conflict among the different class members because each class member would be interested in proving that the specific fees it paid reflects the alleged overcharge. As examples, defendants note that intercept processors do not pay processor fees or ATM operation fees, and pay only certain transaction fees. Defendants assert that intercept processors, therefore, would only be interested in proving that the fees it did pay reflect the alleged overcharge. (D.I. 100 at 23) Likewise, authorization processors and full service participants, defendants argue, would only be interested in proving that the specific fees they paid reflects the alleged overcharge. (D .I. 100 at 24) Defendants also assert that small and large financial institutions would have conflicting interests. According to defendants:

A small institution would seek to prove that the expenses to the network for ATM transactions did not fall as the volume increased, in order to attribute as much of the higher prices paid by the smaller institution as possible to anticompetitive profits. A larger institution that received volume discounts and paid lower prices, by contrast, would argue that expenses to the network for transactions did fall as volume increased due to economies of scale, in order to show that the entire fee schedule, including the relatively cheaper prices paid by the large institutions, reflected anticompetitive profits. Counsel for the class can only assert one of these theories, and some class members would therefore lose out.

(D.I. 100 at 22-23; 54 at 23-24) Finally, defendants note that the complaint identified five separate

geographic markets based on state boundaries. (D.I. 100 at 25) Defendants argue that class members from one state may have conflicting interests with class members from another state. As an example, defendants explain that a Pennsylvania class member may be able to establish that it was charged supracompetitive prices by comparing Pennsylvania fees to New Jersey fees. This damage theory, defendants argue, would benefit Pennsylvania class members (like Marian Bank) at the expense of New Jersey class members. (D.I. 100 at 26)

*19 Plaintiff argues that the conflicts identified by defendants are speculative. Plaintiff asserts that MAC's fee schedule is not complex and can be easily compared on a classwide basis to facilitate the calculation of each class members' damages. Plaintiff has proposed three different methods to determine the amount of overcharge for the class:
(1) Comparing MAC's prices to competitor third party processors;
(2) Comparing MAC's prices to those of other ATM networks; and
(3) Comparing MAC's profits to those of competitors.

(D.I. 80 at 20) Plaintiff notes that damage calculations may be based on computer summaries of each class members' charges, which can be easily obtained since the entire network is computerized. (D.I. 80 at 20) Plaintiff argues that those MAC members that paid the monthly minimum actually have a greater incentive to protect the interests of the class since they were overcharged the most. (D.I. 107 at 6, n. 5) Plaintiff also notes that any potential conflicts between class members are minimal since full service participants constituted 74% of MAC members. (D.I. 80 at 20; D.I. 47, Ex. 10 at E1348) Finally, plaintiff argues that it has no intention of comparing prices on a state-by-state basis. (D.I. 107 at 7-9) Instead, plaintiff asserts that its damage theories involve comparing prices between different ATM networks or between different ATM network processors. (D.I. 107 at 8)

In considering the parties' arguments, the court finds that the potential conflicts based on the MAC fee structure do not preclude satisfaction of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

adequacy of representation prerequisite. Defendants have not challenged plaintiff's proposed methods of calculating the alleged overcharge. Indeed, the court notes that defendants' method of calculating the alleged overcharge would prevent any class member from being an adequate representative.[FN17] The Third Circuit in *Bogosian* explained that

> FN17. The court is mindful of the Seventh Circuit's admonition:
> It is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified ... [This] is a bit like permitting a fox, although with pious countenance, to take charge of the chicken house.
> *Eggleston v. Chicago Journeyman Plumbers,* 657 F.2d 890, 895 (7th Cir.1981).

[w]hen an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of impact [damages] cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.
561 F.2d at 454. Under the facts of the present case, the court finds that classwide proof that all MAC fees involved an overcharge may be demonstrated by plaintiff's proposed theories.[FN18] There is no indication in the record that these methods would create conflicts or would not be feasible.[FN19] *See Bogosian,* 561 F.2d at 455 (commenting that common proof of impact may be established even if prices fluctuated within a range and were different in different regions, as long as they were higher in all regions than the range which would have existed in all regions under competitive conditions).

> FN18. With respect to the five different geographic markets identified in the

complaint, plaintiff would be precluded from determining fact of damage based on a state-by-state comparison. *See Bogosian,* 561 F.2d at 452 n. 12.

> FN19. Of course, should evidence of conflicting interests arise during the course of litigation, the court would consider motions for decertification of the class pursuant to Fed.R.Civ.P. 23(c).

**(b) Conflicts Based on Marian Bank's Status**

**\*20** Defendants also identify conflicts relating to plaintiff's unique status. According to defendants, conflicts exist because plaintiff is a former MAC customer and has fiduciary duties to the class of excess depositors and creditors. Defendants assert that current customers might have an interest in negotiating a resolution that involved credits or the operation of the network. Former customers, defendants allege, would have no incentive to pursue such a resolution. This conflict is further magnified by the fact that plaintiff owes a fiduciary duty to the class of excess depositors and creditors and, in reality, is no longer a financial institution pursuing its corporate interests.

Plaintiff argues that there is no indication in the record that the interests of former MAC participants are in conflict with those of current MAC participants. According to plaintiff, defendants' allegation that there may be conflicts relating to possible settlement issues is not particularly relevant since injunctive relief relating to the challenged conduct has already been obtained. *See United States v. Electronic Payment Services, Inc.,* Civ. No. 94-208, 1994 WL 730003 (D.Del. Oct.14, 1994). Nevertheless, assuming for purposes of this discussion that the Committee has the authority to pursue third party claims and causes of action in order to generate funds on behalf of the Class of excess depositors and creditors, it is not clear to the court that the individual interests of the present class would not conflict with the corporate interests of the financial institutions contemplated to be members of the proposed class. Certainly plaintiff's client is a completely different animal than the other proposed class members. And aside

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 19

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

from the common interest present among plaintiffs in every case-that of maximizing the return on litigation-the court is unaware of any further commonality. Thus the court is unpersuaded that plaintiff could be an adequate representative of the proposed class of financial institutions.

### 5. Predominance of Questions of Law and Fact

Rule 23(b)(3) provides that a class may be certified if, *inter alia*, "the court finds that the questions of law or fact common to the class predominate over any questions affecting only individual members...." Fed.R.Civ.P. 23(b)(3). In determining whether the common questions of law and fact predominate, the court must focus on the issues required to establish liability. *Christiana,* 136 F.R.D. at 382. Predominance may be established if the resolution of certain common issues significantly advances the litigation "even if their resolution does not alone establish liability." *Id.* (citing *In re School Asbestos Litigation,* 789 F.2d 996, 1010 (3d Cir.1986)).

Plaintiff's five counts against the defendants are as follows: (1) conspiracy to restrain trade; (2) conspiracy to impose an illegal tying arrangement; (3) unlawful monopolization and attempted monopolization; (4) conspiracy to monopolize; and (5) illegal tying arrangement under the Bank Holding Act, 12 U.S.C. § 1 971*et seq.* As already noted, in order to establish liability for these counts, plaintiff must establish (1) a violation of the antitrust laws; (2) fact of damage; and (3) amount of damage. *See Bogosian,* 561 F.2d at 454-456.

**\*21** To establish an antitrust violation under § 1 of the Sherman Act, 15 U.S.C. § 1, plaintiff must prove (1) the existence of a conspiracy, combination, or contract; (2) a restraint on trade; and (3) an effect on interstate commerce. *See Christiana Mortgage Corp. .* 136 F.R.D. at 382 (citing *Weiss v. York Hosp.,* 745 F.2d 786, 812 (3d Cir.1984).* To establish monopolization or attempted monopolization in violation of § 2 of the Sherman Act, plaintiff must prove (1) possession of monopoly power in a relevant market (or a dangerous probability of achieving monopoly

power); (2) a specific intent to monopolize; and (3) that defendants engaged in predatory or anticompetitive conduct. *See Spectrum Sports, Inc. v. McQuillian,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *see also United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). To establish an illegal tying arrangement, plaintiff must prove (1) that the tied and tying products are separate, distinct products/services; [FN20] (2) the seller has "appreciable economic power" in the tying product; and (3) the tying arrangement affects a substantial amount of commerce in the tied market. *See Eastman Kodak Co.,* 504 U.S. at 462-646; *see also Jefferson Parish Hosp.,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). A tying arrangement is "an agreement by a party to sell one [tying] product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citation and internal quotes omitted).

> FN20. For two items to be considered separate and distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide the items separately. *See Jefferson Parish Hosp.,* 466 U.S. at 21-22; *see also Eastman Kodak Co.,* 504 U.S. at 462.

Plaintiff argues that common questions of law and fact predominate because defendants' actions are common to all class members and because most of the common elements of liability may be established without examining the effect on individual class members. According to plaintiff, the proof of a conspiracy to monopolize and impose a tying arrangement can be established on a classwide basis. As an example, plaintiff points to one of defendants' documents entitled, "Third Party Processing Study." (D.I.47, Ex. 16) Plaintiff contends that this document would be utilized at trial to prove that MAC's third-party tying rule was applied to all members of its ATM network, including Marian Bank; that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 20

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

most "severe consideration for preserving the tie was to protect MAC's revenues and prevent the incursion of competition []; that the tying arrangement facilitated monopolization of ATM network access and that MAC knew that competitor third-party processors and ATM networks were anxious to enter the MAC market and could do so only if MAC lifted its anticompetitive restrictions.

(D.I. 107 at 10-11)

Defendants do not challenge plaintiff's assertion that many common elements of liability may be established on a classwide basis. Indeed, the proof of a conspiracy to restrain trade is generally considered a common question that predominates over other issues. *See*7B Wright, et al., § 1781, at 4; *see e.g., Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (1968). Despite these common issues, defendants argue that common issues do not predominate because the required elements of fact of damage and coercion cannot be proved on a classwide basis. According to defendants, these elements will predominate over the other common questions of law or fact.

**\*22** For the reasons stated above, the court is not persuaded by defendants' assertion that fact of damage can only be proven on an individual basis. The court is also unpersuaded by defendants' assertion that "coercion" can only be evidenced on an individualized basis.[FN21]

> FN21. *Compare Bogosian,* 561 F.2d 434, and *Bogus v. American Speech & Hearing Assn.,* 582 F.2d 277 (3d Cir.1978), and *Little Caesar Enterprises v. Little Caesar Enterprises,* 172 F.R.D. 236 (E.D.Mich.1997)*with Kellam Energy, Inc. v. Duncan,* 668 F.Supp. 861 (D.Del.1987) (citing *Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)).

**(6) Superiority of the Class Action**

The second requirement under Rule 23(b)(3) is that the court find that "a class action is superior to

other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Generally, if common questions are found to predominate in a proposed antitrust class action, courts have found that the class action is a superior method of settling the controversy. *See*7B Wright, et al., § 1781, at 23. Four factors, however, should be considered in making this determination: (1) whether other members wish to control the action or bring separate actions; (2) whether other suits have already been commenced; (3) whether it is desirable to concentrate litigation in a particular forum; and (4) whether difficulties are likely to be encountered in managing the class action. *See Christiana Mortgage Corp.,* 136 F.R.D. at 385.

Defendants argue that the class action is not superior because the individual members of the proposed class are capable of bringing their own claims. Defendants note the proposed class is not a class of individuals, but rather a class of financial institutions. According to defendants, such class members certainly have the resources and incentive to litigate the proposed claims assuming they were valid. In response, plaintiff asserts that many class members are actually small institutions with one or two branches. Plaintiff argues that the class action is the superior method of adjudication because, *inter alia,* many institutions fear bringing individualized claims against "the most powerful banking interests in the Mid-Atlantic." (D.I. 107 at 17)

The record indicates, and the parties have noted, that no other class members (apart from possibly Royal Bank) have filed their own actions or otherwise indicated an interest in this action. Thus, the first two factors do not preclude certification. The third factor favors certification since there is a potential for inconsistent judgments if similar suits were initiated in other forums. The fourth factor does not disfavor certification since the court has no reason to believe that the proposed class could not be managed properly. Finally, the court is unpersuaded by defendants' argument that the class action device is not appropriate because the class members are sophisticated commercial entities. Defendants have not challenged the assertion that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 21

Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

the class includes many small financial institutions. Accordingly, the court finds that the class action would be an appropriate method for adjudicating this controversy.

### III. CONCLUSION

For the reasons stated above, the court holds the Assignment of the post-April 17, 1992 claims is invalid and unenforceable because plaintiff lacks the authority to pursue third party claims. For the same reasons, the court also concludes that plaintiff has not satisfied the prerequisites of class certification under Fed.R.Civ.P. 23. Consequently, the court shall grant defendants' motion for partial summary judgment and deny plaintiff's motion for class certification. An appropriate order shall issue.

D.Del.,1997.
Bank v. Electronic Payment Services, Inc.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

70 Fed.Appx. 615                                                    Page 1

70 Fed.Appx. 615, 2003 WL 21543889 (C.A.3 (N.J.))
**(Cite as: 70 Fed.Appx. 615)**

C
Roberts v. Mayor and Burgesses of London
Borough of Brent
C.A.3 (N.J.),2003.
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please
use FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
        United States Court of Appeals,Third Circuit.
         Clarence P. **ROBERTS**, Appellant,
                            v.
     The **MAYOR** AND **BURGESSES** OF THE
         LONDON BOROUGH OF BRENT.
                     **No. 02-2126.**

                  Argued on June 2, 2003.
                  Decided July 9, 2003.

Plaintiff brought complaint seeking declaratory
judgment against London borough, and alleging
injury that consisted of the taking of his property by
the borough pursuant to a judgment of the Chancery
Division of the British High Court. The United
States District Court for the District of New Jersey,
Faith S. Hochberg, J., dismissed with prejudice for
lack of subject matter jurisdiction, and plaintiff
appealed. The Court of Appeals held that: (1)
federal district court's error in dismissing complaint
prior to service of process on defendant was
harmless error where it was clear from face of
complaint that district court lacked subject matter
jurisdiction; (2) federal district court did not have
subject matter jurisdiction over plaintiff's action
against London borough; and (3) federal district
court did not err in dismissing plaintiff's complaint
claim without granting plaintiff leave to amend.

Affirmed.
West Headnotes
**[1] Federal Civil Procedure 170A ⇌1828**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1828   k.   Time   of
Determination;   Reserving   Decision.   Most   Cited
Cases
Supervisory rule exists that federal district court
generally may not dismiss a suit prior to service of
process.

**[2] Federal Courts 170B ⇌893**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk893   k.   Particular   Errors   as
Harmless or Prejudicial. Most Cited Cases
Although it constitutes error for federal district
court to dismiss action prior to service of process on
defendant, that error may be harmless under certain
circumstances, such as when it is apparent, on the
face of the complaint, that district court lacks
subject matter jurisdiction.

**[3] Federal Courts 170B ⇌893**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk893   k.   Particular   Errors   as
Harmless or Prejudicial. Most Cited Cases
Federal district court's error in dismissing complaint
prior to service of process on defendant, which was
London borough, was harmless error where it was
clear from face of complaint that district court
lacked subject matter jurisdiction.

**[4] Declaratory Judgment 118A ⇌209**

118A Declaratory Judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 Fed.Appx. 615

70 Fed.Appx. 615, 2003 WL 21543889 (C.A.3 (N.J.))
**(Cite as: 70 Fed.Appx. 615)**

118AII Subjects of Declaratory Relief
   118AII(K) Public Officers and Agencies
      118Ak209 k. Counties and Municipalities and Their Officers. Most Cited Cases
Federal district court did not have subject matter jurisdiction over plaintiff's action against London borough, where plaintiff's alleged injury consisted of the taking of his property by borough pursuant to judgment of Chancery Division of the British High Court (Chancery Division), and redressability of plaintiff's injury depended on future actions of the Chancery Division, which was independent actor not before federal district court, and complaint contained no indication of why the Chancery Division would vacate its judgment if federal district court issued the declaratory judgment that plaintiff sought. U.S.C.A. Const. Art. 3, § 1 et seq.

**[5] Federal Civil Procedure 170A ☞1838**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1837 Effect
               170Ak1838 k. Pleading Over. Most Cited Cases
Federal district court did not err in dismissing plaintiff's complaint claim without granting plaintiff leave to amend, where absence of subject matter jurisdiction was apparent from the face of a complaint, so any amendment would be futile.

**\*616** On Appeal from the United States District Court for the District of New Jersey. (Dist. Court No. 02-cv-01064). District Court Judge: Faith S. Hochberg.

Andrew M. Moskowitz (argued), South Orange, NJ, for Appellant.

Before ALITO, ROTH and STAPLETON, Circuit Judges.

OPINION OF THE COURT
PER CURIAM.
**\*\*1** Clarence P. Roberts ("Roberts") appeals an order of the United States District Court for the

District of New Jersey ("District Court") dismissing his complaint against the Mayor and Burgesses of the London Borough of Brent ("Brent") with prejudice for lack of subject matter jurisdiction. For the reasons stated below, we affirm the judgment of the District Court.

Because we write only for the parties, we need not discuss the factual background of this case. Roberts makes three contentions on appeal. First, Roberts argues that the District Court was not authorized to dismiss his complaint before he could serve Brent with process. Second, Roberts maintains that even if the District Court could dismiss the complaint prior to service of process, the District Court was required to allow Roberts leave to amend his complaint. Finally, Roberts avers that the District Court erred by determining that it lacked subject matter jurisdiction over Roberts's suit. We address Roberts's contentions in turn below. Because the present case involves only disputes of law, our review is plenary. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (3d Cir.1989).

I.

Roberts claims that a District Court cannot dismiss a complaint on its own motion before the plaintiff serves process on the defendant. In support of this proposition, Roberts cites *Urbano v. Calissi*, 353 F.2d 196 (3d Cir.1965), and *Mayberry v. Prasse*, 449 F.2d 1266 (3d Cir.1971). In *Urbano*, the District Court dismissed the plaintiffs' complaint prior to service of process on the defendants. We vacated the **\*617** District Court's judgment and remanded for further proceedings. In a brief opinion, we stated that since it "appear[ed] that none of the defendants ha[d] been served with the complaint," it was "desirable that the action be permitted to proceed in the customary manner." *Urbano*, 353 F.2d at 197. In *Mayberry*, the District Court dismissed the plaintiffs' action pre-service "without any consideration of the merits." *Mayberry*, 449 F.2d at 1266. We vacated and remanded, stating simply that "the district court should have followed here the advice given in the *Urbano* case." *Id.* at 1267.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 Fed.Appx. 615, 2003 WL 21543889 (C.A.3 (N.J.))
**(Cite as: 70 Fed.Appx. 615)**

[1] We agree with Roberts that *Urbano* established the supervisory rule that a District Court may not dismiss a suit prior to service of process. This rule rests on three sound prudential grounds. First, the dismissal of a complaint prior to service of process can compromise the District Court's appearance of impartiality. *SeeOates v. Sobolevitch,* 914 F.2d 428, 431 (3d Cir.1990) (citing this consideration in favor of the proposition that a District Court may not dismiss a complaint prior to service of process under Fed.R.Civ.P. 12(b)(6)). Second, "[w]hile [a] district court may aim" by dismissing a complaint prior to service of process "to clear its docket of what appears to be a meritless case and relieve the defendants of the time and expense needed to respond, if an appeal is taken the case shuttles between the district and appellate courts."*Id.* Finally, in such circumstances "the appellate court ... will likely be without the aid of opposing counsel to clarify the issues." *Id.*

**2 [2][3] We do not, however, read *Urbano* to foreclose the possibility that dismissal for lack of subject matter jurisdiction prior to service of process may be harmless error. Such a reading would be inconsistent with the grounds on which *Urbano* was decided. To support our conclusion in *Urbano,* we cited a Ninth Circuit decision, *Harmon v. Superior Court,* 307 F.2d 796 (9th Cir.1962), in which that court reversed a District Court decision dismissing a complaint prior to service of process. Importantly, *Harmon* was not decided on the ground that dismissal before service of process is always improper. Instead, *Harmon* emphasized that a "District Court always has power to dismiss for lack of jurisdiction .... at any time that such lack appears." *Harmon,* 307 F.2d at 797. It was the *Harmon* court's determination that the District Court *had* jurisdiction pursuant to 28 U.S.C. § 1343 , not a blanket rule prohibiting dismissal prior to service of process for lack of jurisdiction, that formed the basis for its conclusion. *Id.* at 797-98. We would not likely have relied on *Harmon* in *Urbano* if we held the view that dismissal prior to service of process always constitutes reversible error.[FN1] Moreover, preserving the possibility of harmless error in these circumstances comports with Fed.R.Civ.P. 61, which recognizes that "any ruling or order" by a *618 District Court may constitute

harmless error. *See*Fed.R.Civ.P. 61 ("No error in ... any ruling or order ... by the court ... is ground for .. . disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."). Accordingly, we hold that while it constitutes error for a District Court to dismiss an action prior to service of process on the defendant, that error may be harmless under certain circumstances.

> FN1. Our recognition of the possibility of harmless error in this context aligns our jurisprudence in this area with that of several other circuits that have concluded that dismissal of a complaint for lack of subject matter jurisdiction is appropriate even where such dismissal occurs prior to service of process. *See*Joyce v. Joyce, 975 F.2d 379, 386-87 (7th Cir.1992) (affirming the dismissal of a complaint for lack of subject matter jurisdiction prior to service of process); *Zernial v. United States,* 714 F.2d 431, 433-34 (5th Cir.1983) (affirming a dismissal prior to service of process on the ground that " [s]ua sponte dismissal for lack of subject-matter jurisdiction is, of course, proper at any stage of the proceedings"); *Franklin v. Oregon,* 662 F.2d 1337, 1342 (9th Cir.1981) ( "In contrast to dismissals for failure to state a claim, if the court lacks subject matter jurisdiction, it is not required to issue a summons or follow the other procedural requirements.") (citing *Loux v. Rhay,* 375 F.2d 55, 58 (9th Cir.1967)).

Although we need not enumerate all of the possible circumstances under which the dismissal of a complaint prior to service of process may amount to harmless error, we believe that one such situation obtains where it is apparent, on the face of the complaint, that the District Court lacks subject matter jurisdiction. This determination comports with Fed.R.Civ.P. 12(h)(3), which categorically states that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 Fed.Appx. 615

Page 4

70 Fed.Appx. 615, 2003 WL 21543889 (C.A.3 (N.J.))
**(Cite as: 70 Fed.Appx. 615)**

dismiss the action." Fed.R.Civ.P. 12(h)(3); *see also Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (" [S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level."). As we explain below, we believe that the District Court in the instant case erred by dismissing Roberts's complaint prior to service of process on Brent, but that such error was harmless because it was clear from the face of Roberts's complaint that the District Court lacked subject matter jurisdiction.

[4] For a District Court to possess subject matter jurisdiction over a plaintiff's action under Article III of the Constitution, the plaintiff must have standing to sue. *ACLU-NJ v. Twp. of Wall,* 246 F.3d 258, 261 (3d Cir.2001). A "plaintiff only has Article III standing if," inter alia, " 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' " *Pitt News v. Fisher,* 215 F.3d 354, 361 (3d Cir.2000) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). When the question whether a plaintiff's " 'claims of economic injury would be redressed by a favorable decision ... depends on the unfettered choices made by independent actors not before the court[ ] and whose exercise of broad and legitimate discretion the court[ ] cannot presume either to control or to predict,' " *US Ecology, Inc. v. United States DOI,* 231 F.3d 20, 24 (D.C.Cir.2000) (quoting *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989)), the plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to ... permit redressability of injury," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

**3 In the instant case, Roberts's alleged injury consists of the taking of his property by Brent pursuant to the judgment of the Chancery Division of the British High Court ("Chancery Division"). Roberts argues that if the District Court issued a declaratory judgment stating that he had not been served in compliance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (the " Convention"), that declaration "would likely cause

the court in the English action to vacate its order." Brief for Appellant at 13. The redressability of Roberts's injury therefore depends on the future actions of the Chancery Division, an "independent actor not before the court." Roberts was thus required to plead facts suggesting that the Chancery Division would vacate its order if the District Court issued a declaratory judgment in Roberts's favor.

**619 Roberts's complaint, however, contains no indication of why the Chancery Division would vacate its judgment if the District Court issued the declaratory judgment Roberts seeks. Accordingly, Roberts's complaint failed to allege that his injury was redressable by a favorable decision. The District Court therefore correctly determined that it lacked subject matter jurisdiction over Roberts's action.

Since it was apparent from the face of Roberts's complaint that the District Court did not have subject matter jurisdiction over Roberts's suit, we hold that, although the District Court erred by dismissing Roberts's complaint prior to service of process, the District Court's error was harmless.

II.

[5] Roberts next contends that the District Court erred by failing to afford him leave to amend his complaint. In support of this proposition, Roberts cites Fed.R.Civ.P. 15(a), which states that "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." Fed.R.Civ.P. 15(a). Since no responsive pleading had yet been served on Roberts at the time the District Court dismissed his suit, Roberts argues, Roberts should have been allowed to amend his complaint.

It is well established that even before a responsive pleading has been filed, a District Court may dismiss a plaintiff's claim without leave to amend where "any amendment would be futile." *Shane v. Fauver,* 213 F.3d 113, 116 (3d Cir.2000); *see also Grayson v. Mayview State Hosp.,* 293 F.3d 103, 108 (3d Cir.2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 Fed.Appx. 615

70 Fed.Appx. 615, 2003 WL 21543889 (C.A.3 (N.J.))
**(Cite as: 70 Fed.Appx. 615)**

defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile."); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986) ("If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.").

**4 We have held that where the absence of subject matter jurisdiction is apparent from the face of a complaint, any amendment would be futile, and hence dismissal without leave to amend is proper. *SeeMiklavic v. USAir,* 21 F.3d 551, 557-58 (3d Cir.1994) ("[W]e find that granting leave to amend would have been futile on [the] ground .... [of] lack of subject matter jurisdiction."). As noted above, it was clear from Roberts's complaint that the District Court lacked subject matter jurisdiction over his suit.[FN2] Accordingly, the District Court was not required to grant Roberts leave to amend.

> FN2. At oral argument, Roberts acknowledged that he is not currently suffering injury as a result of threats by Brent to execute the Chancery Division's judgment in the United States.

### III.

For the foregoing reasons, we affirm the judgment of the District Court.

C.A.3 (N.J.),2003.
Roberts v. Mayor and Burgesses of London Borough of Brent
70 Fed.Appx. 615, 2003 WL 21543889 (C.A.3 (N.J.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



Westlaw.

211 U.S.P.Q. 876

1981 WL 40556 (D.Del.), 211 U.S.P.Q. 876

**(Cite as: 211 U.S.P.Q. 876)**

Page 1

**H**

Superior Models, Inc.
v.
Tolkien Enterprises et al.

District Court, D. Delaware

No. 78-396

Decided Aug. 14, 1981
United States Patents Quarterly Headnotes

## TRADEMARKS
**[1] Pleading and practice in courts (§ 67.63)**
Defendants that had elected not to argue motions for summary judgment on theory that names were distinctive and thus entitled to protection without proof of secondary meaning, and instead chose to argue motions on theory that assuming names were non-distinctive, evidence of secondary meaning had been established, cannot argue point previously not raised, in motion for reargument.

## TRADEMARKS
**[2] Evidence -- Of confusion (§ 67.337)**
**Fraud and misrepresentation (§ 67.37)**
**UNFAIR COMPETITION**
**Fraud, deception and palming off (§ 68.55)**
Imitation may supply some evidence that there is likelihood of confusion resulting from one party's use of term that has been popularly associated with another product and producer; it is necessary, however, that there be some other evidence of secondary meaning before deliberate "passing off" is found to exist.

## UNFAIR COMPETITION
**[3] Marks and names subject to ownership -- Secondary meaning (§ 67.523)**
Mere imitation is not sufficient proof to establish secondary meaning.

## UNFAIR COMPETITION
**[4] Pleading and practice in courts -- Motions -- For summary judgment -- In general (§ 53.6331)**
**Identity and similarity -- How determined -- In general (§ 67.4051)**
**Marks and names subject to ownership -- Secondary meaning (§ 67.523)**
Summary judgment against alleged trademark holder is warranted unless there is evidence from which secondary meaning and likelihood of confusion may be found; use of names in connection with figurines, without more, is insufficient to generate requisite confusion unless names have acquired secondary meaning.

*876 Action by Superior Models, Inc., against Tolkien Enterprises, a division of Elan Merchandising, Inc., and The Saul Zaentz Production Company, for declaratory judgment of non-infringement and no unfair competition, antitrust violations, and tortious interference with relationships with distributors, in which defendants counterclaim for Lanham Act violations, unfair competition, and deceptive trade practices. On motion for reargument following order granting summary judgment in part. Decision modified.

Modifying 211 USPQ 587.

William J. Wier, Jr., Robert Jacobs, Suzanne Curran Donovan, and Bader, Dorsey & Kreshtool, all of Wilmington, Del., for plaintiff.

James S. Green, and Connolly, Bove & Lodge, both of Wilmington, Del. (Esther O. Kegan, Jane Shay Lynch, and Kegan, Kegan & Beckman, all of Chicago, Ill., and Malcolm Burnstein, and Bendich & Burnstein, both of San Francisco, Calif., of counsel) for defendants.

COPR. © 2007 The Bureau of National Affairs, Inc.

211 U.S.P.Q. 876                                                                                    Page 2

1981 WL 40556 (D.Del.), 211 U.S.P.Q. 876

**(Cite as: 211 U.S.P.Q. 876)**

Steel, Senior District Judge.

Defendants' motion for reargument is based upon four alleged errors in the opinion. All pertain to the Court's treatment of secondary meaning. The alleged errors are:

1. The Court's holding that defendants must establish a secondary meaning for the Tolkien names before they can claim exclusive rights to them against the plaintiff is based upon the Court's erroneous interpretation of Judge Latchum's order dated April 2, 1979. [FN1] A proper construction of that order, defendants argue, would have required this Court to eliminate from its opinion all references to copyrights.

The copyright references appear only at two pages of the opinion, page 8 and page 11. Assuming that these references are inconsistent with Judge Latchum's order, they will be eliminated by striking page 8 of the original opinion and filing a new page 8, a *877 copy of which is attached hereto, and by striking from page 11 the following:

> "Those names are connected with Norse mythology and being uncopyrighted are in the public domain unless a secondary meaning has attached to them."

2. The Court's holding that defendants must prove that the Tolkien names had acquired a secondary meaning is based upon the Court's error in failing to find that the Tolkien names are distinctive.

It is too late for this point to be raised. Throughout this long proceeding, the filing of three briefs by defendants and the oral argument, defendants have never before contended that the Tolkien names were distinctive, and consequently, that they need not prove secondary meaning as a condition to protecting their rights. Rather defendants have consistently argued that assuming that the Tolkien names were used in ancient mythology and were in the public domain, the names were protected under the Lanham Act because secondary meaning either had attached or was in the making.

Defendants' initial brief for summary judgment was filed March 24, 1980 (Doc. No. 73). [FN2] In it, defendants argued at pages 15-20, that "[a]ssuming, arguendo, that the names in question were used in ancient mythology, * * *, public domain material could acquire protectible trademark significance 'so long as it is shown to have acquired independent trademark significance, *identifying in some way the source or sponsorship of the goods.*' (Emphasis added) Frederick Warne & Co., Inc. v. Book Sales, Inc., [481 F. Supp. 1191, 1196, 205 USPQ 444, 448-449 (S.D.N.Y. 1979)]." The defendants continued that the "nexus linking the term[s] for which protection is sought with its 'sponsor' is known as 'secondary meaning.' Defendants contend that the present record is conclusive to establish that secondary meaning links the terms at issue with Tolkien so that no question of fact remains." (Doc. No. 73, p. 16). In defendants' next brief filed October 8, 1980 (Doc. No. 79), supporting defendants' motion for summary judgment on all non-antitrust counts, defendants stated at pages 20-21:

> "Plaintiff makes the surprising admission that 'the only manner by which one may appropriate an historical or mythological name is to imbue that name in the public mind with a secondary meaning, an association with the user* * *.' (Pl. Br. p. 30). That is, while defendants do not concede that these contested terms are fully 'historic or mythological,' they do agree that secondary meaning renders them fully protectible and proprietary.

> "Obviously, the parties disagree with respect to whether secondary meaning was 'attached' to defendants' benefit in this case."

Significantly, even while aware of plaintiff's argument that at least certain of the names at issue derived from ancient sources (Thorin, Strider, Gandalf, Hobs and Middle Earth from Norse mythology and Golem from the Bible, see Plaintiff's Brief filed July 7, 1980, p. 6), defendants did not raise any argument that these or the other names at issue were "distinctive." Defendants simply replied that "plaintiff is not selling bible stories." (Doc. No.

COPR. © 2007 The Bureau of National Affairs, Inc.

Page 3

1981 WL 40556 (D.Del.), 211 U.S.P.Q. 876

**(Cite as: 211 U.S.P.Q. 876)**

79, p. 22). "The record proves that defendants have passed even the plaintiff's test — they have established secondary meaning inuring to Tolkien Enterprises. Therefore, they are entitled to protect their rights in the Tolkien character names." Id. at 25.

Defendants' final brief filed January 9, 1981 (Doc. No. 83), similarly failed to base any claims upon the distinctiveness of the names in question and reasserted that "[p]laintiff's acts and admissions prove secondary meaning." (Doc. No. 83, p. 8). Defendants did argue that to Mr. Lamb, plaintiff's artist, "the secondary meaning was so strong that some of the characters had *no* meaning (historical, mythological, or otherwise) to him besides the Tolkien properties." Id. at 9. Defendants made no suggestion, however, that it was unnecessary for defendants to prove that the Tolkien names had acquired or were in the process of acquiring a secondary meaning and that anything other than secondary meaning was the standard against which the Court should judge the case.

Finally, at oral argument on March 26, 1981, the Court asked the question, "Your position is that a secondary meaning has been established?", to which counsel for defendants answered, "Yes." [FN3]

[1] Defendants elected not to argue the motions for summary judgment on the *878 theory that the Tolkien names were distinctive and thus, entitled to protection without proof of secondary meaning. Instead, they chose to argue the motions on the theory that assuming that the names were non-distinctive, the evidence of secondary meaning had been established. Having lost on this theory, consistently presented, defendants would now inject into the case a new theory previously known but withheld. Whether this choice was made by defendants for tactical reasons or otherwise is not important. At this late date, it cannot argue the point previously not raised.

3. The Court's ruling that defendants failed to present any evidence that plaintiff's use of the names confuse or tend to confuse the public as to the source of plaintiff's products.

Defendants urge that likelihood of confusion, as a matter of law, could have been inferred by plaintiff's conduct in imitating or taking the Tolkien names for the products sold by plaintiff. Defendants argue that "imitation may supply the place of proof; the plagiarist's motive can only be some advantage to himself." 3 Callmann, Unfair Competition, Trademarks and Monopolies §82.2 (b) (1). Defendants contend that "imitation" of the Tolkien names by the plaintiff in this case raises a material issue of fact, making summary judgment in favor of plaintiff inappropriate.

[2] Of course, imitation may supply some evidence that there is a likelihood of confusion resulting from one party's use of a term which has been popularly associated with another product and producer. It is necessary, however, that before deliberate "passing off" is found to exist there be some other evidence of secondary meaning. Thus, in a case cited earlier by defendants (Doc. No. 83, p. 10, filed Jan. 9, 1981), Mortellito v. Nina of California, 335 F. Supp. 1288, 1295, 173 USPQ 346, 350 (S.D.N.Y. 1972), before the Court reached the issue of "wilful appropriation," the Court had concluded:

"For her name, Nina [Mortellito] has acquired a secondary meaning in that her name has been used long and extensively enough to have become known to a substantial number of present or prospective needlepoint purchasers and understood by them to designate the goods of the plaintiff."

See also National Lampoon, Inc. v. ABC, 376 F. Supp. 733, 747, 182 USPQ 24, 33-34 (S.D.N.Y.), aff'd, 497 F.2d 1343, 182 USPQ 6 (2d Cir. 1974) (secondary meaning also established).

Defendants' argument goes beyond the law of these cases. When reduced to its essence, defendants' argument asserts that whenever an action for trademark infringement is based upon an alleged infringer's use of a term which "imitates" a term claimed as a trademark by another party, a Court would not be able to render summary

COPR. © 2007 The Bureau of National Affairs, Inc.

211 U.S.P.Q. 876

1981 WL 40556 (D.Del.), 211 U.S.P.Q. 876

(Cite as: 211 U.S.P.Q. 876)

Page 4

judgment against the alleged mark's holder. According to Callmann,

> "If a defendant can legally do that which he did, the fact that he was motivated by an intent to do wrong does not taint his act, nor does it give rise to a cause of action against him; if confusion is unlikely, motive alone does not affect the defendant's right to use a mark or have it registered."

3 Callmann, id. §82.2(b)(1).

[3] In response to defendants' argument in this case, courts have used "imitation" or "copying" to corroborate a finding of intentional infringement or secondary meaning once other proof of secondary meaning has been established. See National Lampoon, Inc. v. ABC, 376 F. Supp. 733, 747, 182 USPQ 24, 33-34 (S.D.N.Y.), aff'd, 497 F.2d 1343, 182 USPQ 6 (2d Cir. 1974). Mere imitation is not sufficient proof to establish that secondary meaning.

[4] Significantly, defendants do not claim error in the Court's determination that none of the evidence evaluated -- the survey and testimonial evidence of plaintiff's agents -- is sufficient to support secondary meaning. They claim that imitation alone is sufficient to raise an issue of fact precluding summary judgment against defendants in this case. The law, however, is that unless there is evidence from which secondary meaning and likelihood of confusion may be found, summary judgment against the alleged trademark holder is warranted. See Kirkland v. National Broadcasting Co., 425 F. Supp. 1111, 1115-17, 198 USPQ 560, 563-565 (E.D. Pa. 1976), aff'd, 565 F.2d 152 (3d Cir. 1977); B&L Sales Associates v. H. Daroff & Sons, 421 F.2d 352, 165 USPQ 353 (2d Cir.), cert. denied, 398 U.S. 952, 165 USPQ 747 (1970). That standard is as the Court stated at page 11 of the Opinion of June 16, 1981: "use of the names in connection with [plaintiff's] figurines, without more, is insufficient to generate the requisite confusion unless the Tolkien names have acquired a secondary meaning."

4. The Court's interpretation of Ms. Kegan's letter of April 14, 1978 to Coulter-Bennett, Ltd. as an "admission" that the exclusive right to use the Tolkien *879 names had then not been established at the time that plaintiff began to use the names. See Opinion of June 16, 1981, pp. 19-20.

In view of the fact that this portion of the opinion is not a necessary element in reaching the merits of defendants' contention that defendants were in the process of creating a secondary meaning and thus, deserving of trademark protection, the first complete sentence on page 20 of the original opinion will be deleted, viz., "This is, in effect, an admission that the exclusive right to use the Tolkien names had then not been established at the time that plaintiff began to use the names." This deletion does not, however, affect the Court's subsequent discussion of "secondary meaning in the making," in the plaintiff's decision in favor of the plaintiff on Count I and the two counterclaims.

Plaintiff's motion for reargument is based upon the contentions that the Court, in holding that summary judgment should be granted for defendants on Count III (tortious interference with business relations), utilized an erroneous legal standard, shifted the burden of proof in showing privilege away from defendants to plaintiff and failed to perceive factual disputes which should have precluded summary judgment on this Count.

Plaintiff contends that contrary to the Court's original opinion, there is sufficient evidence in the record to warrant a finding of bad faith on the part of the defendants and thus, of tortious interference with plaintiff's business relationships. It argues that the Court improperly placed the burden of establishing defendants' bad faith in the summary judgment proceedings upon the plaintiff in this case. According to Bowl-Mor Co. v. Brunswick Corp., 297 A.2d 61, 66 (Del. Ch.), appeal dismissed, 297 A.2d 67 (Del. 1972), the burden of proof in showing privilege as a defense in a tortious interference case rests upon the interferor. [FN4] It further submits that the Court's finding that the defendants acted "in good faith" conflicts with other findings made by the Court regarding whether or

COPR. © 2007 The Bureau of National Affairs, Inc.

211 U.S.P.Q. 876                                                    Page 5

1981 WL 40556 (D.Del.), 211 U.S.P.Q. 876

**(Cite as: 211 U.S.P.Q. 876)**

not secondary meaning existed in favor of the defendants for the names in question.

In view of the Court's disposition of plaintiff's arguments, pages 31-34 of the original opinion will be withdrawn in their entirety and replaced by the following:

*Count III -- Tortious Interference*

Count III of the Amended Complaint alleges that threats of litigation by defendants sent to plaintiff and distributors of plaintiff's "Hobbit Line" of figurines constituted tortious interference with plaintiff's business relationships. These threats are alleged to have "chill(ed) the relationship between plaintiff and its distributors, causing such distributors to be fearful of handling plaintiff's products, for fear of incurring litigation themselves." Amended Complaint P15. Plaintiff refers to the letter of July 11, 1978 sent on behalf of Tolkien Enterprises to plaintiff and its distributor, Coulter-Bennett, Ltd., threatening litigation if plaintiff continued using the Tolkien names in the sale and advertising of its figurines. Doc. No. 75A, exh. A1. A subsequent letter of December 21, 1979, not specifically mentioned in the Amended Complaint, was sent on behalf of Tolkien Enterprises to the American Express Co., a potential distributor of plaintiff's goods, informing American Express of the filing of this suit and of defendants' counterclaims. Doc. No. 75A, exh. A16.

In order to establish a case for tortious interference, it is necessary to show four elements:

(1) a valid business relationship or the expectancy of one between the plaintiff and a third party or parties;

(2) knowledge by the defendant of that relationship or its expectancy;

(3) intentional interference by the defendant causing the termination of that relationship; and

(4) resulting damages.

Bowl-Mor Co. v. Brunswick Corp., 297 A.2d 61

(Del. Ch.), appeal dismissed, 297 A.2d 67 (Del. 1972); Unit, Inc. v. Kentucky Fried Chicken Corp., 304 A.2d 320, 322 (Del. Super. 1973); 45 Am.Jur.2d, Interference §50 at 322 (1969). The evidence already cited shows without dispute that plaintiff has satisfied the first three requirements. Other evidence of resulting damages, albeit of an imprecise nature, has been presented to the Court. See Doc. No. 75A, exhs. A14 & A15.

On the other hand, actions taken by one who interferes with another's business relationships must always be considered in light of a privilege to compete or protect one's own business interests in a lawful manner. DeBonaventura v. Nationwide Mutual Insurance Co., 419 A.2d 942, 947 (Del. Ch. 1980), aff'd, 428 A.2d 1151 (Del. 1981); **880 Bowl-Mor, Co., supra, 297 A.2d at 66. The Restatement of Torts §773 (1939) provided:

> "One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction."

Cited in Unit, Inc. v. Kentucky Fried Chicken Corp., 304 A.2d 320, 333 (Del. Super. 1973).

The Restatement (Second) of Torts §768 (1979) states a rule for interference with the business relations of a competitor.

> "One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

COPR. © 2007 The Bureau of National Affairs, Inc.

211 U.S.P.Q. 876

1981 WL 40556 (D.Del.), 211 U.S.P.Q. 876

(Cite as: 211 U.S.P.Q. 876)

Page 6

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing withthe other."

If plaintiff and defendants are competitors within the meaning of section 768, then the fact question arises whether the acts of defendants create or continue an unlawful restraint of trade. Unquestionably, a fact-finder could find that plaintiff and defendants were competitors. Comment c, id. at 40, states that "this Section applies whether the actor and the person harmed are competing as sellers or buyers *or in any other way, and regardless of the plane on which they compete.* " (Emphasis added).

In this case, defendants threatened litigation against plaintiff, a competitor of a licensee of the defendants, and against prospective and actual distributors of the goods of the plaintiff. Doc. No. 75A, exhs. A1 & A16. The letter to plaintiff and its distributor, Coulter-Bennett, Ltd., mentioned expressly that defendants' licensee, Heritage Models, was a competitor of plaintiff. Id., exh. A1. In this way, plaintiff and the defendants themselves could be found to be competitors within the scope of the Restatement (Second) of Torts.

Whether the actions of defendants did or did not create an unlawful restraint of trade will have to be decided by a fact-finder, after trial, based upon the issues confronting the parties under Count II, the antitrust count. In addition, whether defendants' action are deemed "wrongful" will, in part, depend upon a fact-finder's determination of the good faith of the defendants in threatening litigation. A comment to the Restatement (Second) of Torts §767 , the more general section, states that litigation and threats of litigation are ordinarily wrongful "if the actor has no belief in the merit of the litigation or if, though having some belief in its merits, he nevertheless institutes or threatens to institute the litigation in bad faith * * *." Id., comment c at 31.

In determining whether or not the defendants acted in good faith in asserting an exclusive right to use

the Tolkien names, a fact-finder will be faced with several questions. These may include whether defendants knew or should have known that they did not have the right they claimed (as determined by this Court in its discussion of Count I) and whether evidence of defendants' good faith is sufficient to carry defendants' burden of proof in showing privilege. In this regard, Ms. Kegan's letter of April 12, 1978 may be some evidence but it is not conclusive on this point. In addition, a fact-finder must fix damages, if any, for any injuries to plaintiff's business due to defendants' conduct.

These issues present material issues of fact making summary judgment inappropriate for Count III. The cross-motions for summary judgment on Count III will therefore be denied.

[FNa1] This series of contracts is the basis of the contracutal claim of defendants to the exclusive right to use the Tolkien names. None of the contracts, however, was effective to accomplish this purpose unless prior to defendants acquiring rights under them, or thereafter, the Tolkien names had acquired a secondary meaning before plaintiff began to use them.

> FN1 Count I of the original complaint sought a declaratory judgment that plaintiff's activities infringed no copyrights possessed by defendants. Defendants moved to dismiss Count I on the ground that defendants did not claim that plaintiff was guilty of copyright infringement. On April 2, 1979, Judge Latchum entered an order granting defendants' motion as to Count I and granting plaintiff leave to file an amended Count I to eliminate all references to copyright or copyright infringement.

> FN2 It did not deal with Count I but related solely to Court II, the antitrust count.

> FN3 No transcript of the hearing was prepared but the reporter's notes were read to the Court by the reporter.

COPR. © 2007 The Bureau of National Affairs, Inc.

211 U.S.P.Q. 876

1981 WL 40556 (D.Del.), 211 U.S.P.Q. 876

**(Cite as: 211 U.S.P.Q. 876)**

> FN4 Compare the Restatement (Second) of
> Torts §767 at 38: "there is little consensus
> on who has the burden of raising the issue
> of whether the interference was improper
> or not and subsequently of proving that
> issue."

> FNa1 This formalized a prior, oral
> arrangement among the parties, under
> which Elan had already begun to use the
> name "Tolkien Enterprises" in soliciting
> licensees for commercial tie-ins to the
> motion picture production of Zaentz. The
> agreement provided expressly, however,
> that the agreement did not serve to add to
> or expand any rights granted under the
> prior contracts. Id., pt. III.

D.Del.

211 U.S.P.Q. 876

END OF DOCUMENT

COPR. © 2007 The Bureau of National Affairs, Inc.

## CERTIFICATE OF SERVICE

I, Katharine L. Mayer, one of the attorneys of record for Defendant, TemPay, hereby

certify that on this 10th day of December, 2007, I caused a true copy of the within *Reply Brief in*

*Support of Defendant's Motion to Dismiss For Failure to State a Claim* to be placed in the

United States First Class Mail, postage prepaid, addressed as follows:

>Mr. William Boyd
>602 Tamara Circle
>Newark, Delaware  19711

>/s/ Katharine L. Mayer
>Katharine L. Mayer (DE Bar ID #3758)